# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. SHIVA AYYADURAI,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM FRANCIS GALVIN, in his official capacity as the Secretary of the Commonwealth of Massachusetts,<br><br>Defendant. | CIVIL ACTION<br>NO. 1:20-cv-12080-MLW |

## AFFIDAVIT OF MICHELLE K. TASSINARI

I, Michelle K. Tassinari, on oath depose and state on personal knowledge and based on my review of the records of the Elections Division of the Office of the Secretary of the Commonwealth of Massachusetts (hereinafter, "the Elections Division") as follows:

1. I am the director and legal counsel to the Elections Division. I have been legal counsel since April 2000 and director since 2005. As such, I have personal knowledge of the matters set forth herein.

2. The Office of the Secretary of the Commonwealth through the Elections Division is responsible for administration of state and presidential primaries and elections in the Commonwealth of Massachusetts, including, among other things, responsibility for the printing of nomination papers, the receipt of certified nomination papers, the printing of candidate lists and ballots, both official, early and absentee, certification of state primary results and compilation of state election results.

2

3. I am familiar with the candidacy of Shiva Ayyadurai for United States Senate, first as a Republican candidate in the September 1, 2020 primary election, and then as a write-in candidate for the November 3rd General Election.

4. Following the September 1 primary, on September 9, 2020, the Elections Division received a public records request from Ayyadurai for: "(1) All Scanned Digital Ballot Images from all jurisdictions in Massachusetts pertaining to the September 1, 2020, State Primary; (2) All Cast Vote Records (CVRs) from all jurisdictions in Massachusetts pertaining to the September 1, 2020 , Massachusetts State Primary; and (3) The List of Vote Records (LVR), also called the Vote Cast Log, Cast Ballot Log, or other designation, from all jurisdictions in Massachusetts pertaining to the September 1, 2020, Massachusetts State Primary." On September 21, 2020, Ayyadurai filed a "follow up" to his request in which he reiterated his request, apparently under the mistaken belief that a response to his request was due within 10 calendar days instead of 10 business days.

5. At 10:47am on September 24, I responded to Ayyadurai by email, informing him that no responsive records existed and that no ballot images existed because the certification of voting equipment in Massachusetts prohibits the capturing of ballot images. Ayyadurai responded seeking a citation for the prohibition on capturing ballot images. I responded again at 11:44 am on September 25, attaching copies of the certification for two different types of digital scan equipment in Massachusetts (which, in any event, are not used by every municipality in Massachusetts – some do not use scanning equipment to tabulate ballots).

6. In Massachusetts, all voters mark their votes on a paper ballot. This includes disabled voters who may opt to use an AutoMark machine at their polling location to assist them

in marking their ballot. There are, however, different methods used for tallying those paper ballots.

7. For the 2020 State Primary Election held on September 1 and the 2020 Statewide General Election held on November 3, 59 municipalities hand counted their paper ballots and the remaining 292 used an electronic tabulator to count votes on their paper ballots. 73 municipalities used Accuvote voting machines, 7 municipalities used Optech voting machines, 37 municipalities used DS200 voting machines and 175 used Imagecast voting machines. These four machines are the only machines certified and being used in Massachusetts elections.[1]

8. In accordance with state law and regulation, before any voting equipment can be used in Massachusetts, it must be federally certified and thereafter approved by the Secretary's Office. Equipment must first be submitted for an office demonstration and be successfully used in two field tests before it can be approved for general use. During the office demonstration, staff from the Elections Division mark multiple ballots, tally those votes by hand, deposit them into the tabulator and then compare the hand count to the machine count for accuracy and to ensure there are no anomalies. Once equipment is certified by the Secretary's Office, any city or town can vote to use it to count votes at any elections.

9. Voting equipment used in Massachusetts does not create or store ballot images. Of the equipment listed in Paragraph 7, only the Imagecast and the DS200, which fall into the category of digital scanning machines, have the technological capacity to create digital ballot images. However, as a condition of certification in Massachusetts, that functionality must be

---

[1] Both the Imagecast and DS200 have compatible high-speed scanners that are certified for use in Massachusetts at a central tabulation facility for processing early voting ballots in accordance with applicable regulations.

disabled. I have confirmed with the vendors of the Imagecast and DS200 voting equipment that the scanning functionality was disabled for the September 1st State Primary and November 3rd General Election and that no ballot images were created. Both the Imagecast and the DS200 read the completed vote indicators, which are ovals filled in by the voter next to their choices on the paper ballots. Accuvote and Optech voting machines are not digital scanners but rather are optical scanners that do not have the technological capability to create an image of a ballot; they merely scan paper ballots for marked vote indicators and tabulate those vote indicators. For Accuvote machines, the vote indicator is an oval that the voter fills in, and for Optech machines, the vote indicator is an arrow that the voter must complete.  The voting equipment used in Massachusetts meets the federal standards, as certified by an independent testing lab, that require recording each vote precisely as indicated by the voter and producing an accurate report of all votes cast, and does not "weight" votes.

10. The paper ballots for each election are the official records of the votes cast in that election, and are maintained by local election officials as required by law.  For federal elections, like the September 1st State Primary and the November 3rd General Election, the cast ballots have been sealed and will remain sealed and secured for 22 months following the date of each respective election.

11. The Secretary's Office is responsible for printing ballots for the state primaries and election.  Ballots used for voters voting absentee or early, either in-person or by mail, have the words "Early/Absentee Official Ballot" printed in the header.  Ballots used for voters voting at a polling place on Election Day only reference "Official Ballot." However, the remainder of the information contained on those ballots are identical, including candidate names and timing

marks used by the equipment to read the votes.  Accordingly, none of the four types of voting machines certified for use in Massachusetts distinguish between votes cast using these two types of ballots.

12. By regulation, all voting machines are tested before each and every election. Local election officials must mark at least 50 ballots for each precinct (in a primary, local election officials must mark at least 50 ballots per party for each precinct), which must be hand counted, deposited into the tabulator and then the results from the hand count compared to the machine count. This testing process is performed in public and notice is posted at least 3 days in advance.  If, during the testing process, there are any problems, including tabulation errors and/or mechanical failures, the local election official is required to report those errors to the Secretary's office.  The Elections Division did not receive any reports of tabulation errors, inaccuracies or mechanical failures from testing done before the September 1st State Primary or the November 3rd General Election.

13. After the close of polls on Election Night, municipalities that use tabulator machines print the tapes which contain the total votes counted for the precinct at which each tabulator was used.  Those totals are then included in a total tally sheet, on which election officials also record votes cast on any ballots that could not be read by the tabulator and are hand-counted, as well as any write-in votes, which are also hand-tallied. Those precinct level totals are combined to create a total tally for each city and town.  Votes are not counted separately by how they were cast, i.e., using an absentee or early ballot or on Election Day.

14. The Imagecast and the DS200 machines are capable of generating a "Cast Vote Record," but only if the municipality has purchased additional software, which is not required by

the Secretary's Office or by the certification standards set forth in regulation. The Accuvote and Optech voting machines cannot produce such records, even with additional software.

15. After each presidential election, post-election audits are conducted in Massachusetts. State law requires that the ballots cast in 3% of precincts statewide – this year, 66 precincts -- be hand counted. Those precincts are selected in a public, non-computerized, random drawing that occurred this year on November 5, 2020. As required by law, the selected precincts hand counted their ballots for offices of Electors for President and Vice President, Senator in Congress, Representative in Congress, Senator in General Court, and Representative in General Court, as well as one of the state-wide ballot questions, which was also chosen during the drawing.

16. In 2016, 99.16% of the votes recorded on Election Day were the same as during the audit. In 2016, local election officials reported that they believed that some of the difference may have come from human error during the audit. In particular, local election officials believed that at least some of the discrepancies came from different judgment calls in determining the intent of the voter made during the audit than on election night by poll workers.

17. In 2020, of the 66 precincts audited, 100,349 cast ballots were counted on Election Night and local election officials reported that they counted 100,422 ballots during the post-election audit, which resulted in 73 additional ballots being counted among all 66 precincts. The additional 73 ballots account for 0.07% of ballots audited. Of the 66 precincts audited, 47 reported no changes in the number of ballots cast, while 14 precincts reported changes of fewer than 5 ballots, likely due to tabulator jams and poll worker error in reading the message on the tabulator indicating whether or not the jammed ballot had been counted. The majority of the

additional ballots were identified in 4 audited precincts in which local election officials reported that the poll workers failed to tally a small number of ballots not read by the machine, which should have been hand-counted by the poll workers on Election Night. In one precinct, a difference of 12 fewer ballots in the audit may be the result of poll workers incorrectly tallying votes for every office on ballots containing write-in votes, rather than counting only the write-in votes for the offices not already counted by the tabulator.

18. In the post-election audit reports from both 2016 and 2020, the local election officials reported that many errors were attributed to ballots being marked contrary to instructions, ballots being incorrectly hand-tallied by poll workers, or ballots not being tallied on Election Night as they should have been.

19. Relevant to Plaintiff's claims, this year's audit resulted in candidate Markey receiving an additional 81 votes, candidate O'Connor receiving 28 fewer votes, and Plaintiff receiving 88 additional votes. The report noted that:

> The number of votes reported on Election Night as "All Others" was reduced by 60 and the blank votes were reduced by 81. It is likely that write-in candidate SHIVA AYYADURAI gained additional votes during the audit that were on ballots not segregated by the tabulator because voters did not fill in the vote indicator next to the write-in space, and poll workers failed to categorize write-in votes for the candidate separately from "All Others."

20. The audit results did not differ from the initial results in any systemic or consistent way, as one would expect to see if tabulators were being employed improperly (for example, using weighted calculations).

21. After each primary and election, candidates can petition for a recount and request that the ballots be counted by hand. Candidates who receive total votes within one half of one

percent of the votes received by the winner may request a statewide or district-wide recount by filing a petition signed by one-fourth the number of voters required to sign nomination papers for state primary candidates as set forth in state law. Candidates who do not fall within that margin may request precinct level recounts by filing petitions signed by 10 registered voters in each precinct of a town, 10 registered voters in each ward of a city, except Boston, which requires 50 voter signatures per precinct. As set forth in section 88 of chapter 142 of the Acts of 2019, for the September 1st State Primaries, the deadline to file petitions for recounts was 5:00 p.m. on September 4, 2020. As set forth in section 135 of chapter 54 of the General Laws, the deadline to file recount petitions for the November 3rd General Election was 5:00 p.m. on November 13, 2020.

22. For all elections, including the September 1st State Primaries and the November 3rd General Election, each city and town uses a paper voter list to record voters who are voting. This list contains the names and addresses of eligible voters for each precinct. The list is marked for each voter participating in the election. For a primary election, local election officials must also record the party ballot selected by voters not enrolled in a party.

23. After each primary and general election, the local election officials use those paper voter lists to update voter activity in the statewide database of registered voters. This information can be updated manually or by scanning a barcode printed on the voter list. There are often some small discrepancies between the number of voters checked on the paper list and the number of names contained on an electronic file produced after the data is entered in the statewide database. These discrepancies can be caused by inaccurate scanning, failing to save progress as data is entered, or inability to scan in primaries. For example, if a voter is not

enrolled in a party and votes in a primary, but the local election official did not record the party ballot chosen by that voter, the local election official will be unable to update the voter activity.

24.     The discrepancy in the electronic list provided to the Defendant from the City of Boston is easily explained.  When the data was requested and provided to the Defendant, the City of Boston had not finished updating the voter activity from the paper lists using the process described above.

25.     Just as the paper ballots are the official records from the election, the original voter lists used in each city and town are the official records of the election and will be retained for 22 months following a federal election.

26.     Under the provisions of section 115 of chapter 54 of the General Laws, the Secretary's Office "shall lay before the governor and council the copies of the votes cast" for senators and representatives in congress, councillors, senators and representatives in the general court, register of probate and sheriff, which are thereafter certified by the governor and council in accordance with section 116.

27.     In keeping with this statutory requirement, the Secretary's Office transmitted a "Return of Votes" book to the Governor's Council setting forth totals and a city/town breakdown of all results from the November 3 general election on Tuesday, November 24, 2020. On Wednesday, November 25, 2020, the Governor's Council voted to certify these results.

28.     On November 30, 2020, Governor Baker signed, and the Secretary attested to, a "Certificate of Election" stating that Edward J. Markey was duly elected as Senator in Congress for Massachusetts, as required by federal law and the Senate Rules.  That certificate was

transmitted to the President of the United States Senate on December 1, 2020. A copy of the certificate and letter of transmittal are attached.

Signed under the pains and penalties of perjury this 4th day of December, 2020.

/s/ Michelle K. Tassinari
Michelle K. Tassinari



# The Commonwealth of Massachusetts
William Francis Galvin, Secretary of the Commonwealth
Elections Division

December 1, 2020

Julie E. Adams
Secretary of the Senate
c/o Office of Public Records
P.O. Box 77578
Washington, DC 20013-7578

Dear Secretary Adams:

On behalf of Secretary of the Commonwealth William Francis Galvin, enclosed please find the Certificate of Election for U.S. Senator Edward J. Markey from Massachusetts, duly elected on November 3, 2020.

I have also enclosed a copy of the Return of Votes showing the number of votes received for Senator Markey. The election results were certified on November 25, 2020 in accordance with state law.

Please let me know if you have any questions.

Very truly yours,

Michelle K. Tassinari
Director/Legal Counsel
Elections Division

Enclosures

# The Commonwealth of Massachusetts

To the President of the Senate of the United States:

This is to certify that on the third day of November, two thousand and twenty

## Edward J. Markey

was duly chosen by the qualified electors of the Commonwealth of Massachusetts a **Senator** from said Commonwealth to represent said Commonwealth in the Senate of the United States for the term of six years, beginning on the third day of January, two thousand and twenty-one.

Witness: His Excellency the Governor, Charles D. Baker, and Our Great Seal hereto affixed at Boston, this thirtieth day of November in the year of Our Lord two thousand and twenty.

*[signature]*

By His Excellency the Governor

*[signature]*
Secretary of the Commonwealth