US DISTRICT COURT FOR MASSACHUSETTS

Dr. SHIVA AYYADURAI,  )
          Plaintiff,   )        Case No. 1:20-CV-12080-MLW
                 )
          v.        )
                 )
WILLIAM F. GALVIN,  )
in his official capacity as  )
Secretary of State,  )
CHARLES D. BAKER  )
in his official capacity as  )
Governor of Massachusetts,  )
          Defendants.  )

**AMENDED VERIFIED COMPLAINT**

ABSTRACT
A CONCISE STATEMENT OF CLAIM UNDER RULE 8

Plaintiff Dr. Shiva Ayyadurai ("Dr. Shiva") presents un-rebutted mathematical evidence

demonstrating that computer algorithms for weighting votes were used in the 2020 U.S. Senate

Republican primary to debase – dilute – the vote of both Dr. Shiva and every person who voted

for him such that they were turned into 2/3rds of a person. This extraordinary violation of the

Equal Protection Clause as applied to the states via the 14th Amendment, which guarantees

**"One Person, One Vote,"** demands extraordinary relief from this court.  Plaintiff therefore

seeks an order to decertify the 2020 U.S. Senate race as well as a transparent hand count of the

paper ballots cast in the 2020 U.S. Senate primary race.  Defendant William F. Galvin

("Galvin"), the Secretary of State for Massachusetts, intentionally employed computer

algorithms to manufacture fraudulent results, which Defendant Charles D. Baker ("Baker"), the

Governor of Massachusetts, certified, though he had ample notice that the results were

unverifiable.  Defendant Galvin destroyed all digital *ballot images* in order to block a quick and

easy way to confirm the use of computer algorithms.  The only way now to ascertain voters'

choice is a hand count of the paper ballots cast. Only this remedy will restore the credibility of

the election, and assure adherence to the principle of **"One Person, One Vote**."

PARTIES

Plaintiff Dr. Shiva Ayyadurai ("**Dr. Shiva**") lives and works in this District. Dr. Shiva was born

in India in 1963 into India's oppressive caste system as a low-caste untouchable. The oppressive

conditions and the corrupt system of centralized planning and governance in India – a product of

British colonialism - motivated his parents to immigrate to the United States in 1970 to seek

greater liberty and respect for individual rights, including the U.S. Constitution's iron-clad

protection for freedom of speech, as well as opportunities for themselves and their children.

Dr. Shiva is a scientist-inventor-educator who earned four (4) degrees from the

Massachusetts Institute of Technology (M.I.T.): bachelors in Electrical Engineering and

Computer Science; master's degree in Mechanical Engineering; master's in Visual Studies; and,

a doctoral degree in Biological Engineering. Dr. Shiva is a Fulbright Scholar, a Westinghouse

Honors Award recipient, a member of multiple research and engineering academic honor

societies including Eta Kappa Nu, Sigma Xi, and Tau Beta Pi, a Lemelson-MIT Awards Finalist,

and was nominated for the National Medal of Technology and Innovation bestowed by the

President of the United States.

As an educator, Dr. Shiva has developed new curricula and taught at both undergraduate

and graduate levels at M.I.T. and has presented invited lectures at leading academic institutions

across the world including the M.I.T. Presidential Fellows Distinguished lecture. In addition Dr.

Shiva is responsible for seven (7) start-up technology companies and presently runs CytoSolve,

Inc. – a biotechnology company; Systems Health, Llc. – an educational institute; and, EchoMail,

Inc. – an artificial intelligence company. Justia's list of Dr. Shiva's patents is at https://patents.justia.com/inventor/v-a-shiva-ayyadurai .

Defendant William Francis **Galvin** is a career politician, presently the Secretary of State for the Commonwealth of Massachusetts, and the person responsible for ensuring that Federal law is complied with during the conduct of elections for Federal office and the constitutional principle of **"One Person, One Vote"** is upheld in Massachusetts. In 1972 Galvin was an aide to the Governor's Council and in 1975 he won his first special election to sit in the Massachusetts House. Galvin has been the Massachusetts Secretary of State for the past twenty-five (25) years.

Defendant Charles Duane **Baker** III is the Governor of Massachusetts. In December 2020 he certified the electronic election result produced by Galvin and declared to the U.S. Congress Edward Markey is the next Senator from Massachusetts despite public notice that a mathematical affidavit raised grave concerns about preservation of **"One Person, One Vote."**

JURISDICTION

This court has jurisdiction because Defendant Galvin consciously violated the Plaintiff's right to Equal Protection under the Constitution, as applied to the states by the 14th Amendment, and debased the vote of both Dr. Shiva and every person who voted for him such that they were turned into 2/3rds of a person, in conscious violation of the guarantee of "**One Person, One Vote**," as declared by the U.S. Supreme Court from *Reynolds v. Sims*, 377 U.S. 533 (1963) through to *Enwenwel v. Abbott*, 578 U.S __(2016).  Jurisdiction is conferred by 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

This court has jurisdiction over this case also because it is a live controversy. Mere certification of a race by the Governor does not deprive the court of jurisdiction when evidence of fraud is apparent from the record, the declared result is unreliable, and un-rebutted

mathematical analysis affirms that the binding principle of "**One Person, One Vote**" has been violated. This complaint seeks decertification of the 2020 U.S. Senate result. *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), *Marks v. Stinson*, 19 F.3d 873 (3rd Cir. 1994) Also, *Collamore v. OCPF*, 67 Mass. App. Ct. 315 (2006)(decertification required if candidate knowingly falsely reported an expenditure or contribution)

Plaintiff has a private cause of action via 42 U.S.C § 1983 to seek remedies from this court. *Roe v. Alabama*, 43 F.3d 574 (11th Cir. 1995)(fundamental unfairness gives rise to a claim under § 1983, citing *Griffin*)

## VENUE

Venue is proper in this district as both Plaintiff and the two defendants live and work within this district.

## B A C K G R O U N D

### FEDERAL MANDATE TO PRESERVE ALL RECORDS

52 U.S.C. § 20702: Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both. ( Pub. L. 86–449, title III, §301, May 6, 1960, 74 Stat. 88 .)

52 U.S.C. § 20702 - Theft, destruction, concealment, mutilation, or alteration of records or papers; penalties
Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

## CENTRALIZED ELECTRONIC TABULATION OF VOTES

The founding fathers were explicit and adamant that the new republic would emphasize a decentralized structure of governance. See *Federalist Paper No. 10*. The founders of the United States insisted on *decentralization* as the bedrock of keeping control in the hands of the people themselves and to make it "more difficult for unworthy candidates to practice the vicious arts by which elections are too often carried." Decentralization ensured a system of open transparent elections and governance that was intentionally the opposite of that practiced in Her Britannic Majesty's United Kingdom.

This remained the practice in this country as long as elections were conducted using paper ballots that were then counted on-site, locally, in view of the locals. The counting of the votes at Dixville Notch, New Hampshire, is always prominently broadcast and promotes the popular image of how the voter's choice is counted.



"Contemporary functional justifications can also be marshaled to support state-law autonomy even in federal elections; indeed, these functional justifications would track the values associated more generally with the decentralized election structure that has long characterized elections in the United States, even for national office ... electoral decentralization, including the radical decentralization involved with leaving individual counties even such choices as how to design ballots, is a structural means of hindering a single set of partisan forces from gaining unified control over drafting and administering election rules. On this view, then, what looks like a chaos of local rules, practices, standards, and structures for resolving national elections becomes a rational, "realist-"inspired means of deploying dramatic decentralization to avoid partisan capture of elections. This functional view would apply just as much to national elections as to any other. The first federal judge to address the merits of the Bush campaign's federal constitutional claims [*Bush v. Gore*, 531 U.S. 98 (2000)], Judge Middlebrooks, took essentially this view:

"Rather than a sign of weakness or constitutional injury, some solace [concerning Florida's highly decentralized electoral system] can be taken in the fact that no one centralized body or person can control the tabulation of an entire statewide or national election. For the more county boards and individuals involved in the electoral regulation process, the less likely it becomes that corruption, bias, or error can influence the ultimate result of an election. *Siegel v. LePore*, 120 F. Supp. 2d 1041, 1052 (S.D. Fla. 2000), *affd*, 234 F.3d 1163 (11th Cir. 2000)"

Corruption can counteract corruption, perhaps, where election regulation and administration is radically decentralized."

Richard H. Pildes, *Judging "New Law" In Election Disputes*, Florida State University Law Review, Vol. 29:691-730 (2002)

After the 2016 elections, two individuals, Amy Cohen and David Becker, "left" their positions at the Pew Charitable Trusts and co-founded an NGO named Center for Election Innovation and Research (CEIR). See https://electionlawblog.org/?p=86274

CEIR has pursued two goals: (1) push states to become participants in the Electronic Registration Information Center – ERIC – voter database that was set up by Pew; and, (2) push local election officials to stop the use of decentralized counting of votes at precincts in favor of

centralized vote tabulation centers. CEIR's main "innovation" is incentivizing local election officials to **centralize the tabulation of digital ballot images** by claiming a cost saving of $15,000 per county after centralization.

Decentralization, a core founding principle of these United States and recognized safeguard against election fraud, could not compete with a cost saving of $15,000 per county.

Centralizing the hitherto decentralized tabulation of ballots allows for the easy transmission of large numbers of digital ballot data to distant back-offices away from local eyes, where large numbers of votes can be weighted and flipped from one candidate to another through the use of computer algorithms such as Weighted Race, without having to deploy a large visible number of software personnel to each individual precinct or county to fiddle with the data locally. The data travels to the vote flippers instead. And the locals have no idea that this happens at all, let alone know what security protocols are employed to secure their vote and who all can access it in a different state or country.

In September 2020, Facebook founder Mark Zuckerberg and his wife, Priscilla Chan, handed $50 MILLION to CEIR (*estd. 2016*) to assist its "innovative" work prior to and during the 2020 elections. This was in addition to the $250 MILLION they handed to a different NGO, Center for Tech and Civil Life (CTCL), which also has existed for less than four (4) years. On December 7, 2020, American Public Media reported that CTCL declined to reveal how it spent the money. https://www.apmreports.org/story/2020/12/07/private-grant-money-chan-zuckerburg-election  On December 8, 2020, National Public Radio then carried part of APM's report with the headline "How Private Money From Facebook's CEO Saved The 2020 Election."

https://www.npr.org/2020/12/08/943242106/how-private-money-from-facebooks-ceo-saved-the-2020-election

In Massachusetts, public officials from 270 towns and cities accepted private money from Zuckerberg-Chan to conduct the 2020 federal elections. In Boston, it is unacceptable for private money to pay for traffic cones or markings on public roads, but it is acceptable for private money to pay for the conduct of public elections and the choices made by public officials.

https://www.universalhub.com/2020/citizen-complaint-day-dorchester-crossing-guards,

https://www.universalhub.com/2018/city-does-not-competition-crosswalks

Louisiana was the sole state that declined to accept private money from the billionaires, citing a state law that prohibited private money funding elections for public office.

CEIR Co-Founder Amy Cohen, who incorporated CEIR at her home address and served as its registered agent, is a named defendant in Plaintiff's related civil RICO lawsuit, *Ayyadurai v. Galvin*, 20-11889.



At some point Cohen was also employed at DemocracyWorks Inc., a private NGO that is funded by the Murdoch family's Quadrivium Foundation, the Rockefeller Brothers Foundation, and by Pew. Around the same time, Amy Cohen became an unperson at CEIR, and CEIR began to list David Becker as the sole "Founder" of CEIR. Plaintiff has been unable to locate a single document that CEIR is required to file with the government that documents a formal separation by Amy Cohen from CEIR.

In 2017, this private NGO that employed Amy Cohen, DemocracyWorks, took over the management of the National Association of State Election Directors (NASED), the official voice for the election directors (public officials) in all fifty states, and appointed Amy Cohen as NASED's Executive Director. This powerful position allows Cohen to coordinate with the National Association of Secretaries of State to push states to centralize the tabulation of votes. In 2018, as NASED's Executive Director, Cohen testified to the Senate Intelligence Committee that Russia actively interfered with the vote count in the 2016 general elections and advocated for changes that promote greater security. https://www.hsdl.org/?abstract&did=817965

Cohen wants us to believe **that centralized digital vote tabulation centers** improve security. NASED is also a named defendant in Plaintiff's related RICO lawsuit, *Ayyadurai v. Galvin*, 20-11889.

In December 2020, the Cybersecurity and Infrastructure Security Agency (CISA) reiterated that its statements regarding the 2020 elections concerned solely threats, domestic and foreign, to the security infrastructure of election systems and that CISA did not declare that no election fraud occurred. See https://twitter.com/i/status/1341047583968538624

## LOCAL TABULATION SITES ALSO PROVIDE AN OPPORTUNITY
## FOR ALGORITHM FRAUD AND DEBASING THE WEIGHT OF VOTES

There is another vital point here that Defendant Galvin has never revealed to this court. Electronic voting systems are ***not*** untouched by human hands, even before any algorithm is used to manipulate the vote count. When paper ballots are scanned in and the machine creates a digital ballot image, the machine then triages the ballot images to determine if they are ballots that qualify for machine processing, meaning they are complete, have marks in the expected locations, have no marks in unexpected locations and the choice of the voter is clear. After triaging, the machine creates two sets of ballot images: the images that are clear to the machine and the images that need adjudication by human officials before tabulation. For example, if 100 images are created and the machine determines that 50 are clear for immediate tabulation and 50 need human adjudication, the clear 50 votes are added by the machine to the tabulation count while the other 50 await human adjudication. This involves transferring those 50 ballot images from the precinct machine to the central tabulation center where the humans are, usually with a thumb drive.

Defendant Galvin has repeatedly asserted under oath that no ballot images were ever created or stored, meaning none was transferred from the machines to anywhere else in a thumb drive.

**What this then means is that ballots determined by the precinct machines to require human adjudication <u>were simply discarded!</u>**

Here is a further important point about how many ballots are discarded: machines can be programmed to discard a certain percentage of ballot images by altering the error rate. It is easy to program machines to discard 30% of ballot images based on how the oval for a certain candidate, such as this Plaintiff, was filled in by the voter. Setting a low error rate would allow

in more votes for a certain candidate without human adjudication and a high error rate would let in fewer votes for a certain candidate without human adjudication.

Given that the Plaintiff has mathematically proved that Galvin used a computer algorithm to manipulate the count and debase the weight of votes cast for the Plaintiff, it is mandatory to examine the possibility that compuer algorithm were used to program a high error rate into the machines, upon Galvin's orders, only for ballots that were cast for the Plaintiff, such that they were set aside for human adjudication, which then never happened.

Given that the MassGOP openly supported Plaintiff's opponent in the Republican primary in order to present a weakling – their "Designated Loser" – to run against Edwared Markey in the general election, it would be mendacious to claim that MassGOP observers at the central tabulation site would have objected.

The only way to see if the ballots were rejected legitimately is by examining the paper ballots themselves because Galvin has deleted the digital ballot images. If the digital ballot images were available it would take less than a day to finish this evaluation. Defendant Galvin deleted the digital ballot images because it is much more difficult to obtain a paper ballot examination.   When Plaintiff on September 25, 2020 posted on Twitter a threaded tweet exposing Defendant Galvin's violation of 52 U.S.C. § 20701 that requires digital ballot images i.e. records that are generated in connection with a Federal election, be preserved for 22 months, Defendant Galvin, Cohen, and NASED, as confirmed in the October 30, 2020 testimony in the related Case 20-11889, strongly encouraged Twitter to ban Plaintiff from Twitter for most of the last month leading up to the general election on November 3, 2020.

At this point, Defendant Galvin still claims he retains physical possession of paper ballots (though he is expected pursuant to 52 U.S.C. § 20701 to retain both paper ballots and

digital ballot images and any and all records generated in connection with a federal election). However, it remains to be seen if in response this court ordering a hand count of the paper ballots whether or not Defendant Galvin will immediately destroy the paper ballots while they are a subject of a lawsuit, as was done by the Broward County Supervisor of Elections Office. https://www.sun-sentinel.com/local/broward/fl-sb-broward-elections-supervisor-broke-law-snipes-canova-20180514-story.html

Given CEIR's and NASED's commitment to centralization of vote tabulation, making the entire process electronic and non-local, it would not be surprising to see them lead efforts, under the guise of cost-savings to local municipalities, to repeal 52 U.S.C. § 20701 completely such that no paper ballots are available, and no independent audit will be possible at all. Galvin's legal counsel Tassinari, who is also the Massachusetts State Election Director, is set to be the next President of NASED.


DIGITAL BALLOT IMAGES ARE INTEGRAL TO ELECTRONIC TABULATION

Defendant Galvin, via the Massachusetts Election Director's affidavit, is on record in the related case that 83% of cities and towns in Massachusetts used electronic voting systems (ImageCast, DS200) in the 2020 federal elections. See *Tassinari affidavit*, ECF # 17-1 (20-11889) This automatically means that digital ballot images were used to tabulate the votes in those jurisdictions. This automatically means that the digital ballot image is the actual ballot used to determine the voter's choice. This automatically makes the digital ballot image a record that must be saved and preserved pursuant to Federal law, 52 U.S.C. § 20701.

This concept is not new by any stretch. Already by the 2018 mid-term elections, courts across the country made findings that digital ballot images are records that must be preserved

pursuant to federal law. Eg. *Hernandez v. Pima County*, C20163926 (Pima Superior, AZ)(Oral argument - https://youtu.be/g4HoUMP-fzI) Election officials in most jurisdictions outside Massachusetts already preserve digital ballot images pursuant to federal law. The electronic voting systems used nationwide are designed to do this easily. Vendors, in fact, themselves sell over-priced USB thumb drives for saving images. Most electronic voting systems automatically save digital ballot images in TWO separate flash drives so that the second set serves as a backup in case of technical errors with the first one. While the first one is used to transfer digital ballots to the tabulator machines, the second set is simply sent to the Secretary of State to serve as a backup record if necessary. This planned redundancy is important to ensure the reported result accurately matches the voters' choice. Unlike most other states, Galvin and Massachusetts consciously contrived a system that intentionally prevents backup files, in order to conceal the fact that votes have been debased.

In Florida, while 32 of the 67 counties saved digital ballot images, eight of the most populous counties, representing 60% of the ballots cast, did not save the images, and so were named defendants in a lawsuit filed in July 2020 by good governance advocates who presented the court facts about the functioning of electronic voting systems. *Thompson v. Lee*, FL Cir. Ct. 2nd Jud. Cir., Leon County, 20-CA-001238

> "The digital ballot images, the unique digital ballot images; they are not copies" of the hand-marked or machine-marked paper ballots, Benedict Kuehne, the plaintiff's lead attorney, said at a mid-August court hearing, responding to an argument by the defendants' attorneys that sought to minimize their role by calling them copies. "They're not photocopies. **They are the vote-counting basis for the determination of the election**." "The counting of the actual vote is what is the requirement of the Florida law, the First Amendment, every election law—counting the true vote of the voter," Kuehne said. "That's the very reason to have and maintain documents, to be able to recast, recount, or verify the ballots and the vote, if put into question."
> "On the opposing side were attorneys for Florida Secretary of State, Division of Elections and elections supervisors led by Nathaniel A. Klitsberg of the Broward County Attorney's Office. He aggressively argued the case should be dismissed[.] While half of

Florida's 67 counties save ballot images, according to documents filed in the case, the populous counties being sued did not want to be forced to do so for the August 18 primary and November 3 general election. (They set their scanners to delete the ballot images once the tabulation has finished.)

***Klitsberg did not contest that the ballot images were a pivotal part of the vote-counting sequence***. But saving the images would slow down polling place operations and voters, his legal team argued, because the USB flash memory drives installed on precinct scanners made by Election Systems and Software (model DS200) would fill up as the voting proceeded. Their August 7 brief said that reporting the precinct results at the end of the night could take hours because their USB flash drives (one, four or eight gigabytes in size) would take 15 minutes to electronically transmit 1,500 ballot images, which fills three-quarters of a 1 GB drive." (emphasis added)

https://votingbooth.media/floridas-eight-biggest-counties-will-save-digital-ballot-images-if-theres-a-presidential-recount/ (September 1, 2020. Steven Rosenfeld is the editor and chief correspondent of Voting Booth, a project of the Independent Media Institute. He has reported for National Public Radio, Marketplace,and Christian Science Monitor Radio, as well as a wide range of progressive publications including Salon, AlterNet, the American Prospect, and many others.)

In August 2020, these eight Florida counties then agreed to preserve all digital ballot images created during the 2020 federal elections, as stipulated:

"For purposes of the 2020 General Election, if, and only if, the Secretary of State orders a machine recount in the race for U.S. President/Vice-President, the Supervisor Parties agree to turn on the "save all images" function in their DS850 High-Speed Tabulators being used for purposes of the recount so that the ballot images (Page 1, Side 1 of the General Election Ballot) for that race are saved. Alternatively, if one or more Supervisor Parties use scanning equipment from Clear Audit/Clear Ballot to scan these ballots, the ballot images for the presidential race can be stored via Clear Ballot/Clear Audit in lieu of DS850 images. Use of the Clear Audit/Clear Ballot system meets the terms of this Stipulation. The upload of the images provided in this paragraph may be done by the Supervisor Parties within a reasonable period of time after the machine recount is completed." - Joint Stipulation

In striking contrast, Defendant Galvin is on record claiming that Massachusetts law prohibits the saving/retention/preservation of digital ballot images, **but has never cited the law.** Galvin actively orders vendors of electronic voting systems to switch OFF the default setting in digital ballot scanners that, pursuant to federal law, automatically SAVES the digital ballot images. **Galvin orders vendors of electronic voting systems to ensure their machines defy federal law in order to be certified by him for use in federal elections in Massachusetts.**

**Even more striking is Galvin's <u>unique claim</u> that electronic voting systems certified for use in Massachusetts do not create digital ballot images at all in the first place.** The documentary evidence available to this court proves beyond even the slightest iota of a doubt that Galvin's claim is atrociously and intentionally false. See pp. 2-7, *Bennie Smith affidavit* (with exhibits, including actual machine manuals). <u>EXHIBIT I</u>

All digital scanners create an electronic image of the scanned paper ballot. This image is stored within the internal Random Access Memory of the machine itself. Later this image may be downloaded to an external hard drive / flash drive for storage. If the ballot image is not downloaded after an election is completed, that data in the machine's internal memory will be over-written by fresh data from the next election when new paper ballots are scanned in, and thus destroyed forever. It is widely known that there is only so much space in a machine's internal memory. This is why efforts are underway in Georgia to impound the ballot machines to prevent the internal data from being overwritten during the upcoming runoff election for U.S. Senate.

Here are the steps from ES&S' own technical manual:

A. First, the paper ballot is scanned, and an image is captured into random access memory (RAM).
B. The scanner then uses the ballot image with the ES&S's patented Intelligent Mark Recognition (IMR) and Positive Target Recognition to process the ballot images.
C. Once the voter's marks are identified and stored, the Digital Scanner then either writes the ballot image in RAM or to the internal USB flash drive or the hard drive of DS850 or both.
D. "If the image is written to the internal USB media, the image file is also digitally signed for added security."
E. "At the close of polls, all image files are encrypted and re-signed before the USB media is removed from each DS200."
F. "For the DS200, no changes can be made to the image capture settings without making changes in the election programming software (in the EMS) and reburning all media" (to USB drives to all scanners.)
G. "For the DS450/DS850, image settings can be changed through the configuration menu on the scanner; however, this requires a change in local County procedures and settings."

H. Election Reporting Manager (ERM) is used to archive the DS200/DS450/ DS850 media, and Electionware will contain and be able to display and export all cast vote records and those ballot images as designated by the user.

Thus, the vendor for the DS200 machine itself, ***certified by Galvin***, declares that electronic ballot images are created (captured from the paper ballot), they may be stored either in the internal RAM or an external Flash drive, and either saved after the election or destroyed. Galvin has intentionally lied to this court in order to obstruct justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) This court may not reward a person with unclean hands. *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238 (1944)

Galvin fabricated his false claim only after Plaintiff made public to millions of viewers on Twitter that Galvin destroyed the ballots used to tabulate the vote for the 2020 federal primary elections and thus his declared result is unverifiable without a hand-count of the paper ballots. Galvin peddles his false claim to make people believe that he did not destroy, in intentional violation of federal law, the digital ballot images used in 83% of Massachusetts to tabulate the vote.   Galvin's false claim is unique in the United States. **<u>Not one other election official in the entire country makes the false claim that digital ballot scanners do not create a digital ballot image and that ballot images are not integral to the electronic tabulation of the voter's choice.</u>**

Galvin is supported in this false claim by only one entity on Earth, a private company named LeadStories.com, that is funded by Mark Zuckerberg's Facebook Corporation. The support extended to Galvin by Zuckerberg via Lead Stories is endorsed by TechDirt:

"In fact, the certification process flat out prohibits the machines from capturing ballot images. Furthermore, many of the machines don't even have the ability to capture images

even if they could under Massachusetts laws. ... The fact checking site Lead Stories did a fact check of the whole thing, agreeing that Shiva's tweets were false...”

TechDirt did not inform its readers that Lead Stories is funded by Facebook.

https://www.techdirt.com/articles/20201101/16264445627/shiva-ayyadurais-lawsuit-against-massachusetts-official-actually-raises-interesting-1st-amendment-question-about-election.shtml

And neither did Universal Hub.

https://www.universalhub.com/2020/serial-senate-candidate-alleges-election-fraud

Unlike TechDirt or Universal Hub, former president Barack Obama has objected to the involvement of Zuckerberg and Facebook in shaping the news: “They are making editorial choices, whether they've buried them in algorithms or not.” https://www.cnbc.com/2020/11/16/former-president-obama-social-media-companies-make-editorial-choices.html  Unlike Galvin, President Obama has publicly acknowledged that choices can be buried in algorithms. This was proved on a global scale by the Volkswagen “clean diesel” emissions algorithm scandal and is common knowledge.



Unlike Galvin, Senator Elizabeth Warren, in a December 2019 letter to Dominion Voting Systems, co-authored with Sens. Ron Wyden, Amy Klobuchar, and congressman Mark Pocan,

warned of machines in South Carolina that did vote "switching" and "improbable" results that "threaten the integrity of our elections."

https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf

The position taken by Galvin (*and Lead Stories [Facebook], TechDirt, Universal Hub et al*) is that because the Plaintiff disagrees with Galvin, perforce the Plaintiff is incorrect. The Texas Supreme Court dismissed the identical argument made by the Texas Secretary of State against candidate Laura Pressley: "It begs the question to assume that Pressley's legal argument is baseless because the Secretary of State disagrees when whether the Secretary of State's interpretation is correct is exactly what she is disputing." *Pressley v. Casar*, 567 S.W.3d 327 (*per curiam*, Tex. 2019)

DIGITAL VOTING SYSTEMS TURN VOTES INTO DECIMAL NUMBERS

Paper ballots represent votes as whole integers meaning one ballot represents one single vote. When paper ballots are transformed into digital ballots, they become a decimal number with a decimal point: 1.0.  This fact became apparent when investigators reviewing the  GEMS voting system – the predecessor of many electronic voting systems in use today – turned on the "show decimals" feature that demonstrated vote cournts are stored in the computer as decimals.

https://blackboxvoting.org/fraction-magic-2/

**STATE OF ALASKA
2004 GENERAL ELECTION
NOVEMBER 2, 2004
UNOFFICIAL RESULTS**

Registered Voters 472160 - Cards Cast 314492   66.61%                    Num. Repo

| US PRESIDENT / VICE PRESIDENT | | Total | |
|---|---|---|---|
| Number of Precincts | | 439 | |
| Precincts Reporting | | 439 | 100.0 % |
| Times Counted | | 292811/472160 | 62.0 % |
| Total Votes | | 218111.00 | |
| Times Blank Voted | | 1524 | |
| Times Over Voted | | 158 | |
| Number Of Under Votes | | 0 | |
| NADER / CAMEJO | POP | 0.11 | 0.00% |
| COBB / LaMARCHE | GRN | 0.02 | 0.00% |
| PEROUTKA / BALDWIN | AI | 0.05 | 0.00% |
| **KERRY / EDWARDS** | DEM | 120360.63 | 55.18% |
| BADNARIK / CAMPAGNA | LIB | 1916.17 | 0.88% |
| BUSH / CHENEY | REP | 95126.02 | 43.61% |

Algorithms apply weights to these numbers. This means a vote could be deemed to be 0.9, meaning less than one, or 1.1, meaning greater than one. Vote tabulators count these decimal numbers, thus resulting in a total vote count of, say, 16.76 or 377.51. Constitutionally this makes no sense because this *per se* violates the principle of **"One Person, One Vote."**  "[T]he idea of treating them as fractions needs to be examined in the light of America's nasty history. We once counted slaves as three−fifths of a person, and this idea sort of interacts with that ghost in our national subconscious." - Roger Robins, political scientist and historian, Marymount University, quoted in *Should 14-year-olds vote? OK, how about a quarter of a vote?*, Christian Science Monitor, March 12, 2004.

As detailed below, this digital transformation of one paper ballot vote into a decimal number that can be multiplied by a certain factor as determined by a computer algorithm, led to Plaintiff's vote changing from 1 to 0.666, thereby reducing him to a 2/3rds person. Once a vote is turned into a decimal number, it becomes an easy target for algorithmic manipulation.

TIMELINE OF THIS CASE

In February 2017, Dr. Shiva first ran for Federal office for the U.S. Senate as an Independent candidate, challenging incumbent Senator Elizabeth Warren, and conducted a dynamic campaign both on the ground across cities and towns in Massachusetts, and on Twitter, with the slogan "Only A REAL Indian Can Defeat A FAKE Indian!"  That election took place in November 2018.  There were no troubles regarding his Twitter account throughout 2017 - 2018 campaign though "election misinformation" was a prominent topic in the daily news.

In January 2019, Dr. Shiva began his run as a Republican candidate for U.S. Senate against incumbent Senator Edward Markey (D). For this, he participated in a primary election within the Republican Party, and met the challenge with a ground organization of approximately 3,100 volunteers, distributed approximately 10,000 lawn signs and 20,000 bumper stickers, received donations from about 20,000 people that funded billboards at prominent spots on highways, advertisements on social media, radio and television, and made "Dr. Shiva" a recognized household name across all 351 cities and towns in Massachusetts.  In addition, Dr. Shiva personally crisscrossed the state and held rallies to reach a diversity of demographics.  It is vital to note that his campaign always met or exceeded all regulatory requirements set by the Elections Division at the Office of the Secretary of State.

In February 2020, one year after Dr. Shiva began his campaign, Kevin O'Connor, in his first run for political office, entered the Republican primary race. O'Connor was however endorsed by the Massachusetts Republican Party – the MassGOP – and by Governor Charles Baker, who held fundraisers for him.

On September 1, 2020, the Massachusetts Republican primary for U.S. Senate was held. Dr. Shiva's internal polls had shown him leading in all counties. The announced results showed

he had won in Franklin County by nearly ten-percent (10%) over his opponent, but had lost in all other counties by a consistent ratio of approximately 60% to 40%, to an opponent with little visibility, only a handful of volunteers, and no real campaign organization.  His opponent, who was endorsed and supported by Charlie Baker and the Massachusetts GOP, apparently won.

Dr. Shiva, who never conceded the race, investigated and discovered that Franklin County was the only county where approximately seventy-percent (70%) of the towns counted the paper ballots by hand. The rest of the counties primarily used electronic systems that generated ballot images, which were then analyzed by a computer program to tabulate vote counts.

Dr. Shiva's campaign filed Public Records Requests to the various counties, under MGL ch. 66, for (a) the list of participating voters – those who actually voted in the election, and (b) the counts of the actual numbers of votes cast.  Seven (7) of the fourteen towns/cities provided the records.  In all seven (7) towns/cities, the number of tabulated votes was larger than the number of participating voters.  Boston had approximately 4,100 more votes than participating voters; and, Newton had approximately 1,700 more votes than participating voters.  Accessing and analyzing the ballot images – which are in the chain of custody of tabulating votes – therefore became critical to understanding the root cause of the discrepancy between Franklin county and the other counties.

On September 9, Dr. Shiva personally went to Secretary Galvin's office to deliver a Public Records Request to the Secretary, under MGL ch. 66, to determine whether or not the Secretary of State stored all digital ballot images, as it is these digital records generated in the course of a federal election, that are used to tabulate votes when ballots are electronically processed.  It is important to note that in all counties, other than Franklin County, the majority of

paper ballots were simply collected and stored. In those counties, which primarily use electronic systems for tabulating votes, the ballot images *__are__* the ballots, since the ballot images are the objects upon which tabulation takes place. The electronic systems employ various computer algorithms during the tabulation process including Weighted Race algorithms that afford the capability to multiply a candidate's vote counts by a decimal factor.  For example, if candidate A received 1,000 votes and candidate B received 1,000, the Weighted Race technique can multiply candidate A's votes by a factor such as 2.5 and candidate B's by a factor of 0.8 to result in final tabulated vote counts for candidate A of 2,500 votes and candidate B of 800 votes, respectively.

Pursuant to Federal law, Galvin is required to securely store or retain for twenty-two (22) months any and all **records** generated in connection with an election for a Federal office, such as U.S. Senate.

On September 24, 2020, Massachusetts Election Director, President-Elect of the National Association of State Election Directors and Secretary of State's Legal Counsel, Michelle Tassinari emailed the following to the Plaintiff:

> On Thu, Sep 24, 2020 at 10:47 AM Tassinari, Michelle (SEC)
> <michelle.tassinari@state.ma.us> wrote:
>
> Good Morning-
>
> I am writing to acknowledge receipt of your request for records. Please note, that this Office does not maintain voter tabulation software, firmware or hardware.  While this office certifies voting equipment, as required by law, we do not purchase or lease equipment.  Once equipment is approved by this Office, cities and towns can purchase or lease such equipment.  Accordingly, this Office has no records responsive to your request.
>
> Further, to the extent you request the same information from local election officials, please note that the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images.
>
> Michelle K. Tassinari
>
> Director and Legal Counsel

Elections Division

One Ashburton Place, Room 1705

Boston, MA 02108

617-727-2828

----------------------------

Tassinari's last sentence, coming as it did from the Secretary's own legal counsel and

Director of the Election Division, struck Dr. Shiva as beyond bizarre given the supremacy of

Federal law. It was remarkable and required clarification. Therefore, Dr. Shiva emailed back:

**From:** Shiva Ayyadurai <vashiva@vashiva.com>

**Sent:** Thursday, September 24, 2020 11:22 AM

**To:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>

**Subject:** Re: Records Request

CAUTION: This email originated from a sender outside of the Commonwealth of
Massachusetts mail system.  Do not click on links or open attachments unless you
recognize the sender and know the content is safe.

Michelle,

Kindly refer me to the statute or law, in which the "...approval of digital scan
equipment in Massachusetts specifically prohibits the capturing of ballot
images."

Thank you in advance.

Warmest regards,

Dr. Shiva Ayyadurai

US Senate Candidate.

-----------------------------

In response to Dr. Shiva's email requesting the specific Massachusetts law or regulation

that apparently authorizes the Secretary to *prohibit* "*capturing of ballot images*" in

Massachusetts,  Tassinari did not cite any law in her September 25, 2020 email response:

On Sep 25, 2020, at 11:45 AM, Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us> wrote:

Shiva-

Attached please find the certification of two different types of digital scan equipment in Massachusetts.

Please note that while the ballot images are not stored, the actual ballots voted on at any federal election are secured and stored for 22 months in accordance with federal law. However, under state law, those ballots must remain sealed until such time as they can be destroyed.

Michelle K. Tassinari

Director and Legal Counsel

Elections Division

-------------------------------------

That email from Tassinari generated the following email response from Dr. Shiva:

From: Shiva Ayyadurai <vashiva@vashiva.com>
Date: September 25, 2020 at 10:33:09 PM EDT
To: "Tassinari, Michelle (SEC)" <michelle.tassinari@state.ma.us>
Cc: John R Brakey <johnbrakey@gmail.com>, Venu Julapalli <vrjula@protonmail.com>, Ralph Lopez <ralphlopez2008@gmail.com>, benniejsmith@gmail.com, Jude Joffe-Block <JJoffe-Block@ap.org>
Subject: Destroying Ballots is Illegal. The Ballot Images ARE the Ballots.  You DESTROYED Them. Period.

Subject:  Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED The Ballots. Period.

Michelle
First, you have NOT answered my question, from my previous email.  I repeat it below. PLEASE answer the question.

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Second, neither the people of Massachusetts nor I are stupid. I presume you must be under incredible pressure from Bill Galvin and Charlie Baker to deflect this issue to hope it disappears.

However, the fact is the State has illegally destroyed ballots. The electronic equipment used to tally and count the vote MUST first CREATE an image - the ballot image - in order for the vote to be processed and COUNTED by the machine.   When that image is created, that image becomes THE BALLOT, as it is THE entity used to

count the vote.  If no image was created, no vote count could exist. You are required by
Federal Law to store,preserve, archive those ballots for 22 months.  If those ballot
images DO NOT exist, they were DESTROYED. This destruction is illegal, and
therefore, the election is null and void.

Once again, please answer my question, above.

Warmest regards,
Dr.SHIVA Ayyadurai
US Senate Candidate
-------------------------------

Tassinari never replied to this email and did not cite the statute that allowed
Massachusetts to destroy the ballot images that were generated in connection with a Federal
election.  It is absurd for Galvin and his staff to claim that state law trumps Federal law where it
concerns a Federal election.

The ballot scanning machines scan the paper ballots and generate a ballot image, which is
then used to tabulate the votes in a Federal election, while the paper ballot is merely physically
retained. It is fundamental statutory interpretation that the ballot image is a *record* and that,
pursuant to 52 U.S.C. § 20701, Secretary Galvin is required to store *all* records which are
generated in connection with a Federal election.  *Owasso Independent School Dist. No. I-011 v.
Falvo*, 534 U.S. 426 (2002), *Kasten v. Saint-Gobain Performance* Plastics Corp., 563 U.S. 1
(2011), *Dolan v. Postal Service*, 546 U.S. 481 (2006), *People v. Aleynikov*, 2018 NY Slip Op
03174 [31 NY3d 383], *Hernandez v. Pima County*, C20163926 (Pima Superior, AZ)

It is important to note that when the Weighted Race feature is enabled, the number of
votes tabulated will likely not match the number of ballot images.  Therefore, access to ballot
images, in the chain of custody, is essential to verifying the integrity of an election.

It is an undeniable fact that the electronic systems for counting votes do generate the
ballot images. That is how they work. Tassinari is incorrect in her use of the term "capturing"
when it comes to these generated images. The images are created, and if they are not captured,

that is merely a euphemism for destroyed.  If she meant that the records are "not stored" after they are generated and used by the tabulation machines that is a written admission of a Federal violation. And that indeed is exactly what Tassinari meant: "the ballot images are not stored[.]"

Tassinari's email conversation with Dr. Shiva intentionally concealed the critical importance of ballot images in the tabulation process of votes in order to create the false impression of the preeminence of paper ballots. The only possible conclusion is that Tassinari, a practicing attorney, chose the word *capture* to mislead and misdirect Dr. Shiva and give the false impression that in Massachusetts digital ballot images never exist, at all, at any time. This is supported by the effort expended by both Tassinari and Galvin's spokesperson, Debra O'Malley, to falsely claim, including in press statements, that the paper ballots are saved and so Federal law has been satisfied, and to consciously create the false impression that it is the paper ballots that are used to tabulate the vote even when electronic machines are used.

**Repeat, the votes, when electronically handled, are tabulated exclusively using the digital ballot images.** Altering digital ballot images or deleting them, as Defendant Galvin has done, breaks the required chain of custody and makes a transparent audit of the electronic vote impossible. *Per se* the declared result is unverifiable and not credible. There is *no* electronic audit trail!

Given that maintaining custody of the records and ensuring transparency and integrity of the electoral process is Defendant Galvin's day job, a responsibility he has held for twenty-five (25) consecutive years, the only possible conclusion is that Defendant Galvin fully intended to prevent even the possibility of a transparent audit and fully intended to cheat the citizens of their choice and violate the principle of **"One Person, One Vote."**

The obstruction by Galvin continued, in order to prevent Plaintiff from accessing the data necessary for a quick electronic audit of the primary race, prior to the expiration of any deadlines for recounts and audits during the election itself. Plaintiff's 41-page affidavit, <u>EXHIBIT II</u>, described the process of asking Galvin for a recount: "***A simple analogy would be to request a photograph from Galvin and him producing a Photoshopped picture each time and claiming it is the original, knowing that he himself has deleted the original, in order to conceal the fact that he himself Photoshopped that image***." It took Plaintiff three months to independently collect and analyze the data presented in his affidavit that mathematically demonstrates the use by Galvin of a computer algorithm that debased the votes cast for the Plaintiff.

## PRAYER FOR RELIEF

### COUNT 1

Violation of the Equal Protection Clause of the 14th Amendment,
42 U.S.C. § 1983

Plaintiff re-alleges all the paragraphs above as if again set forth herein. As described below, Galvin violated the Plaintiff's right to Equal Protection as an individual citizen by debasing the weight of his vote by a third, thus reducing Plaintiff to a 2/3rds person, and again as a candidate for political office by debasing by a third the weight of all the votes cast for the Plaintiff by thousands of citizens of Massachusetts, which resulted in the election being stolen from the Plaintiff and the installation of a representative who does not reflect the accurate choice of the voters.

This is an extraordinary constitutional violation that deserves an extraordinary remedy.

GALVIN'S DEBASEMENT OF THE WEIGHT OF VOTES CAST FOR THE PLAINTIFF
REQUIRES AN EXTRAORDINARY REMEDY

Plaintiff provides this court a sworn affidavit, in <u>EXHIBIT II</u>, detailing mathematical analysis that proves Galvin's declared numbers for the September 2020 Republican primary race may be achieved only if votes for the Plaintiff were multiplied by 0.666 and votes for his opponent were multiplied by 1.22. There is a **One-in-100,000 chance** of Galvin's declared numbers being the result without the use of a computer algorithm to alter the voters' choice. Part of the mathematical data from the affidavit is summarized below.

First is a histogram chart of votes for the Plaintiff across all precincts in Suffolk County. Each "Bin" on the x-axis indicates the number of votes.  The y-axis is used to denote, using the height of the bar, the number of precincts that contain that many number of votes.  So, by way of example, the bin denoted with "3" on the x-axis, with a bar with a height of approximately 27, indicates there are 27 precincts in Suffolk County in which Plaintiff received 3 votes each.



The table chart below highlights each incidence of "High-Low" pairs for the first 22 bins for votes cast for the Plaintiff by precinct in Suffolk County. Note, there are 9 such pairs, out of a total of 11 possible.

Shiva

| Bin | Frequency | |
|---|---|---|
| 1 | 26 | HIGH |
| 2 | 10 | LOW |
| 3 | 28 | HIGH |
| 4 | 10 | LOW |
| 5 | 19 | HIGH |
| 6 | 12 | LOW |
| 7 | 9 | |
| 8 | 11 | |
| 9 | 11 | |
| 10 | 9 | |
| 11 | 13 | HIGH |
| 12 | 6 | LOW |
| 13 | 11 | HIGH |
| 14 | 5 | LOW |
| 15 | 11 | HIGH |
| 16 | 6 | LOW |
| 17 | 14 | HIGH |
| 18 | 6 | LOW |
| 19 | 7 | HIGH |
| 20 | 3 | LOW |
| 21 | 8 | HIGH |
| 22 | 4 | LOW |

This is a corresponding histogram chart and table for Plaintiff's primary race opponent, Kevin O'Connor:



The corresponding table is as follows:

| | KOC | |
|---|---|---|
| Bin | Frequency | |
| 1 | 22 | HIGH |
| 2 | 9 | LOW |
| 3 | 11 | |
| 4 | 17 | |
| 5 | 13 | |
| 6 | 9 | |
| 7 | 11 | |
| 8 | 14 | |
| 9 | 7 | |
| 10 | 9 | |
| 11 | 2 | |
| 12 | 6 | |
| 13 | 5 | |
| 14 | 6 | |
| 15 | 3 | |
| 16 | 1 | |
| 17 | 4 | |
| 18 | 8 | |
| 19 | 3 | |
| 20 | 6 | |
| 21 | 6 | |
| 22 | 9 | |

In Kevin O'Connor's histogram and corresponding table chart, the incidence of "High-Low" pairs is much less pronounced, and the distribution is far more random than in the distribution of votes cast for the Plaintiff.

The question herein is how likely is it that Plaintiff's vote count in Suffolk County could generate 9 or more "High-Low" pairs for the first 22 bins in the histogram, assuming the reported results are fair and unbiased. To answer this question, Plaintiff modeled vote counts by precinct and candidate using a binomial distribution – of 298 precincts x 2 candidates for 596 total distributions. This was used to produce a stochastic model that then ran 100,000 iterations for Suffolk County.  To calibrate the model, Plaintiff compared the average vote results – from the simulation - across those 100,000 iterations for the Republican Primary – with the results for the Republican Primary reported by Secretary Galvin. The reported results for the actual vote for Suffolk County are 10,596. The average vote results from Plaintiff's simulation are 10,597. The two results were near the same, demonstrating that the model is accurate. These results are summarized in the top part of the table chart below:

| Select Number of Iterations: | | 100,000 | |
|---|---|---|---|

| 100,000 Trials - Suffolk County | | | |
|---|---|---|---|
| | Shiva | KOC | Total |
| Simulated Average | 4,247 | 6,350 | 10,597 |
| Actual | 4,245 | 6,351 | 10,596 |

High-Low Incidence for Bins 1 through 22
Model Simulations Results for Shiva Only

| High-Low Incidence | Frequency | Cumulative Frequency | Cumul % |
|---|---|---|---|
| 0 | 2,268 | 2,268 | 2.3% |
| 1 | 9,643 | 11,911 | 11.9% |
| 2 | 18,863 | 30,774 | 30.8% |
| 3 | 23,799 | 54,573 | 54.6% |
| 4 | 20,998 | 75,571 | 75.6% |
| 5 | 13,894 | 89,465 | 89.5% |
| 6 | 7,028 | 96,493 | 96.5% |
| 7 | 2,637 | 99,130 | 99.1% |
| 8 | 709 | 99,839 | 99.8% |
| 9 | 139 | 99,978 | 100.0% |
| 10 | 21 | 99,999 | 100.0% |
| 11 | 1 | 100,000 | 100.0% |
| Total | 100,000 | | |

| # 9 or Greater: | 161 |
|---|---|
| P(9 or Greater): | 0.16% |
| 1 in 621 event | |

The bottom part of the table chart above shows the modeled incidence of "High-Low" pairs for the first 22 bins in the histogram representing reported votes for the Plaintiff.  Based on these results, the appearance of 9 or more "High-Low" pairs in the histogram is fairly rare, occurring only 161 times in 100,000 iterations, or approximately 0.16% of the time.  Stated differently, 9 or more "High-Low" pairs should appear in bins 1-22 of the histogram **only once in every 621 elections**!  These results could be refined a bit by increasing the number of iterations to 250,000 or 500,000, but the overall "message" would not change.

However, in addition to the rare and anomalous stream of "High-Low" pairs in the reported vote results for the Plaintiff, what is even more non-random is the fact that the occurrence of "High-Low" pairs in the frequency distribution was 1.50 or greater.  For example, if one considers the first "High-Low" pair in bin 1 and bin 2, the precincts counts are 26 to 10,

respectively, for a ratio of 2.6.  Similarly, if we consider the next "High-Low" pair in bin 3 and bin 4, the precinct counts are 28 to 10, respectively, for a ratio of 2.8.  This anomaly is even rarer.

To calculate the probability of this anomaly, Plaintiff re-ran the stochastic model, with the occurrence of "High-Low" pairs AND their ratios being 1.50 or greater. The model revealed that in 100,000 iterations, there was one occurrence of 9 "High-Low" pairs having a ratio of 1.50 or greater.  This pattern, to put it simply, would occur **only once in every 100,000 elections** – a probability of nearly 150 times less than the occurrence of just "High-Low" pairs, as in the first case analyzed.

| 100,000 Trials - Suffolk County | | | |
|---|---|---|---|
| | Shiva | KOC | Total |
| Simulated Average | 4,247 | 6,350 | 10,597 |
| Actual | 4,232 | 6,294 | 10,526 |
| High-Low Incidence for Bins 1 through 22 | | | |
| High > 1.50 x Low | | | |
| Model Simulations Results for Shiva Only | | | |
| High-Low Incidence | Frequency | Cumulative Frequency | Cumul % |
| 0 | 18,594 | 18,594 | 18.6% |
| 1 | 31,556 | 50,150 | 50.2% |
| 2 | 26,562 | 76,712 | 76.7% |
| 3 | 14,862 | 91,574 | 91.6% |
| 4 | 6,022 | 97,596 | 97.6% |
| 5 | 1,889 | 99,485 | 99.5% |
| 6 | 424 | 99,909 | 99.9% |
| 7 | 82 | 99,991 | 100.0% |
| 8 | 8 | 99,999 | 100.0% |
| 9 | 1 | 100,000 | 100.0% |
| 10 | 0 | 100,000 | 100.0% |
| 11 | 0 | 100,000 | 100.0% |
| Total | 100,000 | | |

# Greater, with High > 1.5 x Low: 1
P(9 or Greater, with High > 1.5 x Low): 0.0010%
1 in 100,000 event

One important observation of the reported results in Suffolk County is that the "High-Low" pair with ratio of 1.50 or above, reflects that the number of odd numbers occurs twice as

many times as even numbers. Another way of understanding this is to recognize that half of the even numbers are redistributed into odd numbers.

The only way this can be accomplished is by multiplying votes for the Plaintiff by 0.666, as shown below. The first column is the non-weighted ("De-Weighted") votes. After application of the weight of 0.666 and making it a whole integer, we are able to reproduce the reported pattern, as shown in the table below.  In the case of O'Connor, a weight of approximately 1.22 matched his reported results.

| De-Weighted | Weight | Weighted |
|---|---|---|
| 1 | 0.666 | 0 |
| 2 | 0.666 | 1 |
| 3 | 0.666 | 1 |
| 4 | 0.666 | 2 |
| 5 | 0.666 | 3 |
| 6 | 0.666 | 3 |
| 7 | 0.666 | 4 |
| 8 | 0.666 | 5 |
| 9 | 0.666 | 5 |
| 10 | 0.666 | 6 |
| 11 | 0.666 | 7 |
| 12 | 0.666 | 7 |
| 13 | 0.666 | 8 |
| 14 | 0.666 | 9 |
| 15 | 0.666 | 9 |
| 16 | 0.666 | 10 |
| 17 | 0.666 | 11 |
| 18 | 0.666 | 11 |
| 19 | 0.666 | 12 |
| 20 | 0.666 | 13 |
| 21 | 0.666 | 13 |
| 22 | 0.666 | 14 |

The only way to produce a "High-Low" pair with a 1.50 or above ratio is to apply a weight of 0.666 to every vote that Plaintiff received, and 1.22 to every vote that Kevin O'Connor received. Mathematically, there is no other way to reproduce the reported result.

This mathematical data remains un-rebutted to this minute. Reducing Plaintiff and his voters to the status of **2/3rds persons** violated their right to Equal Protection and provides him with a federal cause of action via 42 U.S.C § 1983 that requires extraordinary relief from this court. The reported result must not be allowed to stand. *Reynolds v. Sims*, 377 U.S. 533 (1963)

In the graph below, the solid blue line and the solid red line, chart the cumulated vote totals reported for Kevin O'Connor and the Plaintiff, respectively. The end points denote the reported percentage of votes. For example, O'Connor received a reported 57.0% to Plaintiff's 38.1%. However, given that this reported result is a Weighted result, we can now calculate the De-Weighted result for O'Connor and the Plaintiff, which is shown as the dashed blue line and the dashed red line, respectively.

Once De-Weighting is performed to reverse the debasement by Galvin of votes cast for the Plaintiff, in Suffolk County, Plaintiff would have received 52.5% and O'Connor 43.0%.



This process is further detailed in the mathematical affidavit by Dr. Shiva for all counties that used electronic voting systems with tabulation of digital ballot images and application of Weighting algorithms by Galvin.  Franklin county, which is mostly paper-based, serves as the control for comparison. The charts below provide a summary of the Weighted Race i.e. reported results from Galvin versus the De-Weighted race i.e. actual results that reflect the un-debased choice of the voters.

| | Weighted (Reported) | | | |
|---|---|---|---|---|
| County | KOC-R % | Shiva-R % | KOC-R Votes | Shiva-R Votes |
| Boston | 58.0% | 37.1% | 4,862 | 3,112 |
| Worchester | 59.8% | 37.6% | 3,041 | 1,911 |
| Barnstable | 60.1% | 35.5% | 11,174 | 6,601 |
| Bristol | 57.9% | 39.0% | 12,298 | 8,281 |
| Hampden | 56.3% | 40.4% | 11,184 | 8,030 |
| Hampshire | 55.8% | 41.8% | 2,717 | 2,037 |
| Essex | 57.6% | 39.0% | 18,479 | 12,511 |
| Plymouth | 61.6% | 35.5% | 16,508 | 9,501 |
| Berkshire | 58.4% | 37.5% | 11,579 | 7,440 |
| Middlesex | 57.5% | 39.8% | 31,257 | 21,634 |
| Norfolk | 61.8% | 34.6% | 20,064 | 11,241 |
| Suffolk | 57.0% | 38.1% | 6,351 | 4,245 |
| **Total** | 60.8% | 39.2% | 149,514 | 96,544 |

| | De-Weighted | | | |
|---|---|---|---|---|
| County | KOC-A % | Shiva-A % | KOC-A Votes | Shiva-A Votes |
| Boston | 44.0% | 51.5% | 3,985 | 4,666 |
| Worchester | 45.4% | 52.2% | 2,493 | 2,865 |
| Barnstable | 46.1% | 49.8% | 9,159 | 9,897 |
| Bristol | 48.1% | 48.6% | 9,838 | 9,937 |
| Hampden | 45.6% | 49.7% | 8,669 | 9,434 |
| Hampshire | 45.9% | 51.6% | 2,174 | 2,444 |
| Essex | 42.7% | 54.2% | 14,783 | 18,767 |
| Plymouth | 47.4% | 49.9% | 13,531 | 14,244 |
| Berkshire | 48.8% | 47.0% | 9,263 | 8,928 |
| Middlesex | 43.0% | 54.5% | 25,620 | 32,435 |
| Norfolk | 47.7% | 48.9% | 16,446 | 16,853 |
| Suffolk | 43.0% | 52.5% | 5,206 | 6,364 |
| **Total** | 47.0% | 53.0% | 121,167 | 136,834 |

As can be seen by these numbers, the average De-Weighted county results across Massachusetts (excluding Franklin County) of 53% to 47%, closely track with the results from Frankly County, which was 53% for Plaintiff and 46% for my O'Connor. This finding serves as internal validation for this court, meaning when this court orders a transparent hand count of the paper ballots in all counties that used electronic voting machines, the court should expect to find the actual result in those counties matches the result seen in Franklin County.

It is important to note that the algorithmic intervention applies to votes cast in fully 83% of cities and towns in Massachusetts.

In order to prevent Galvin's (*Zuckerberg's?*) malign intent from being established as the state's certified election result, decertification of the 2020 US Senate race result is required as is a transparent hand count of all the paper ballots cast, beginning with the September 2020 Republican primary race. This remedy is unavoidable and constitutionally required. The US 1st Circuit Court of Appeals ruled in *Griffin* that even a fresh primary election was necessary to ensure the binding principle that the voters' choice must be respected and reflected in the choice of their representative.

> "While the "outcome" test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted [citations omitted], it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for its lack of integrity. . . . Here, the closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted." *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978)

> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harman v. Forssenius*, 380 U.S. 528, 537 (1965)

In our case here, the mathematical analysis reveals that a paper recount is highly likely to lead to a "retroactive invalidation of a potentially controlling number of votes cast" in the 2020 Republican primary. A **One-in-100,000 chance** that Galvin's declared result was without intentional debasement of the weight of votes cast for the Plaintiff (and the vote cast by himself), meets the definition of extraordinary. An extraordinary remedy is required.

> "We agree with Judge Tuttle that in debasing the weight of appellants' votes the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit."
> *Wesberry v. Sanders*, 376 U.S. 1 (1964)

No court should endorse Galvin turning U.S. citizens into 2/3rds persons. Our elections must not be bought and paid for.

Galvin intentionally set out to cover up his crime by submitting a consciously perjurious affidavit which claimed that his legal counsel and state election director, Michelle Tassinari, personally "confirmed" with the vendors of Imagecast and DS200 voting machines that their scanners did not create electronic ballot images during the September 1st Republican Primary and the November 3rd General Election. This claim is staggering, totally unbelievable and perjurious. This claim is an undeniable fraud on the court.

> "Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals...Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions setup to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society...The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)

This court must mandatorily require the vendors to testify under oath about the veracity of the Tassinari affidavit consciously filed by Galvin, whether or not the vendors even communicated with Tassinari, and to prove that their digital scanners did not create digital images for tabulation, which of course, as the court knows already, they cannot do.

CERTIFICATION BY THE GOVERNOR IS NOT FINAL AND DOES NOT OVERRIDE THE PLAINTIFF'S RIGHT TO EQUAL PROTECTION UNDER THE CONSTITUTION

Galvin has provided this court with a copy of the certificate signed by Governor Baker that states that Edward Markey is the state's selection to occupy a seat in the U.S. Senate. Galvin claims that this action, certification, is final, '***set in stone***' as it were, and ***automatically*** deprives this court of jurisdiction.  Galvin, the Chief Election Officer for Massachusetts for 25 years now,

fully knew that was a false statement when he peddled it to this court. Galvin is aware, as are all persons conversant with polling history for the U.S. Senate, including laypersons not in office, that certification by the Governor is easily reversed and has been done so on many occasions.

Plaintiff reminds this court of the events surrounding the 1974 race for U.S. Senate conducted in New Hampshire. Republican Louis Wyman ran against Democrat John Durkin for the seat previously occupied by Norris Cotton, who chose to retire. Initially Wyman was certified by the Governor as the next Senator. After a recount Wyman was decertified and the Governor certified Durkin. After a second tabulation, Durkin was decertified and the Governor certified Wyman. *Wyman v. Durkin*, 115 N.H. 1, 330 A.2d 778 (1975)

Finally the U.S. Senate declared the seat vacant and a fresh special election was held.

https://www.senate.gov/artandhistory/history/minute/Closest_election_in_Senate_history.htm

The 1974 Senate race holds the record for the closest Senate race ever, dragged on for eight full months, ***and involved not just one but two decertifications***. It beggars belief that a professional election official of 25 years standing did not remember this famous fact prior to peddling his false claim to this court. And we are talking about events from 1974, not 1874, and in next-door New Hampshire, not in far off Idaho, at the time that a young Galvin already was immersed in politics. In 1972, Galvin was an aide to the **Governor's Council** himself and fully versed in the legal ins and outs of certification. And in 1975, right around the time of the Wyman-Durkin controversy with its two certifications and two decertifications, he won his first special election as Representative to the Massachusetts State House from Allston-Brighton. It stretches credulity to claim that Galvin would have personally forgotten such a seminal event from his early days in politics.

In addition, when not just innocent errors in transparent paper ballot tabulation, as in the 1974 New Hampshire vote, but active intentional fraud has been shown via mathematical analyses in a sworn affidavit, **mere certification by the Governor means nothing** *per se*. The U.S. 1st Circuit Court of Appeals ruled in *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) that a fresh primary election was necessary to ensure the binding principle that the voters' choice must be respected and reflected in the choice of their representative. This *stare decisis* has been cited by sister circuits.

> "Accordingly, where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated power."
> *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994)

Thus, as a matter of fact and law, mere certification by the Governor does not deprive this court of jurisdiction, and allows the court the authority to provide the relief that the Plaintiff's complaint seeks. This case remains a live controversy well within this court's jurisdiction. There is no bar whatsoever to decertification of the 2020 U.S. Senate race in Massachusetts by this court. Federal courts have a "virtually unflagging obligation" to rule on the merits of cases properly before them. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. ___ (2013) (**unanimous**), *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 US 350 (1989), *England v. Medical Examiners*, 375 U.S. 411 (1964) Given the overwhelming and un-rebutted mathematical evidence that the weight of votes cast for the Plaintiff has been debased by Galvin, that Galvin's denial of equal protection was intentional, systemic and state-wide and not an "isolated error or negligence" in the slightest, and that Galvin willfully engaged in conscious factual misrepresentations in order to cover up his intentional violation, decertification is this court's duty. *Lemon v. Kurtzman*, 411 U.S. 192 (1973)(In shaping equity decrees, the trial court

is vested with broad discretionary power), *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967)(In this vital area of vindication of precious constitutional rights [involving voting]...if affirmative relief is essential, the court has the power and should employ it)

WHEREFORE, for the reasons detailed above that prove the necessity for extraordinary relief in order to vindicate fundamental constitutional rights, Plaintiff respectfully requests this court to:

1. decertify the 2020 U.S. Senate race;

2. order a transparent hand-count of the paper ballots cast in the September 2020 Republican primary;

3. maintain jurisdiction over this case in order to order a fresh U.S. Senate election against Edward Markey (or whoever won the supervised paper recount in the Democrat primary under active court supervision) if, as expected, the hand count of the paper ballots substantiates Plaintiff's mathematical analysis; and,

4. provide such other relief that the court deems just and proper.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai
_____
**Dr. Shiva Ayyadurai**
Plaintiff, *pro se*
701 Concord Avenue
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com

December 25, 2020

CERTIFICATE OF SERVICE

Plaintiff certifies that he served this amended complaint upon Defendant Galvin via counsel Adam Hornstine via ECF, and shall serve upon Defendant Baker via Sheriff.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

Date: December 25, 2020
_____
**Dr. Shiva Ayyadurai**
Plaintiff, *pro se*
701 Concord Avenue
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com