US DISTRICT COURT FOR MASSACHUSETTS

| | | |
|---|---|---|
| Dr. SHIVA AYYADURAI, | ) | |
| Plaintiff, | ) | Case No. 1:20-CV-12080-MLW |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM F. GALVIN, | ) | |
| in his official capacity as | ) | |
| Secretary of State, | ) | |
| CHARLES D. BAKER | ) | |
| in his official capacity as | ) | |
| Governor of Massachusetts, | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF PLAINTIFF IN SUPPORT OF
HIS MOTION FOR DECERTIFICATION
AND A COURT-SUPERVISED HAND COUNT OF PAPER BALLOTS**

ABSTRACT

Defendant William F. Galvin employed the use of a computer algorithm in the 2020

Massachusetts Republican Primary U.S. Senate race to debase the weight of votes cast by the

voters of Massachusetts for the Plaintiff, and denied voters their choice of representative to the

U.S. Senate. Defendant Galvin's actions violated the constitutional principle of "One Person,

One Vote." On September 1, 2020, I recognized that I had been defrauded of my election

victory. I soon came to discover that computer algorithms existed in the electronic voting

systems to manipulate election results. Having learned this, on September 9, 2020, I sought

specific information that by Federal law I was entitled to – ballot images, Cast Vote Records

(CVR), log files, and List of Vote Records – from the Secretary of State's office. This

information would have made it easy to verify if such computer algorithms were used.

Defendant Galvin made it impossible for me to obtain this data. I shared the difficulties of my

efforts on Twitter, specifically the fact that Defendant Galvin had destroyed ballot images in

violation of Federal law.  Defendant Galvin responded by obstructing justice and engaging in racketeering to further sabotage my election prospects by inducing Twitter to ban me for 21 days out of the 35 days prior to the general election using the false pretext that he cared about "election misinformation."  While running my general election WRITE-IN campaign, I was forced to issue public records requests, deploy my own software and technologies to collect and organize data from the ground up to investigate the use of computer algorithms.  This effort took nearly two months longer than if Defendant Galvin had produced the data, which would easily have fit in one external hard drive, at cost of $500, which I was willing to pay. My independent investigation revealed more votes than voters and discovered a statistical improbability of 1 in 100,000 voting pattern based on Suffolk County data. The only explanation for this observation is the use of an algorithm that is enabled in many electronic voting systems called the "Weighted Race" feature. Our mathematical analysis revealed that my voters and I were reduced to two-thirds "2/3rds" of a person. Defendant Galvin deliberately destroyed data to conceal the use of a computer algorithm.  No person interested in election integrity would have done so. Defendant Galvin's actions have now forced me to seek redress by requesting a hand count of paper ballots in all counties.

No election result that reduces citizens to two-thirds "2/3rd's" persons must be allowed by any court to stand. This court has the duty to order the decertification of the 2020 U.S. Senate election results based on the discovery that my voters were reduced to two-thirds  "2/3rd's" of a person.  This automatically entails that the court must immediately order a hand count of all the paper ballots cast in the 2020 primary race.

The court must *not* allow a representative, who was not the choice of the voters, to proceed to the U.S. Senate.

"ONE PERSON, ONE VOTE"

The bedrock principle of American suffrage "One Person, One Vote" is being destroyed by 21st century electronic voting systems – opaque and centralized, and consolidated in the hands of a few.  Software "features" in electronic voting systems enable the multiplication of an individual's single vote by decimal factors – "weights" – either less than one or greater than one. This feature can be used to decrease or increase the count of that one vote so "One Person, IS NOT One Vote."  It is a crime that such features even exist and Secretaries of State and State Election Directors not only certify electronic voting systems containing such features but also actively turn off other features in order to conceal the crime by destroying (not storing) ballot images, the evidence that links tabulated vote counts with the ballots cast; thus, making it impossible to verify election results from those systems.

In this Affidavit, I will present scientific evidence that such features were employed by Defendant Galvin in the September 1, 2020 Massachusetts Republican Primary U.S. Senate race to steal victory from the working people of Massachusetts who wanted me, one of their own, to be their Republican candidate in the general election.  My team of volunteers and I have worked painstakingly over the past nearly ninety (90) days, since September 1, 2020, at great sacrifice to our careers and our families along with many sleepless nights, to educate ourselves on how these complex voting systems operate; to file public records requests in order to ascertain evidentiary documents (while overcoming bullying and abuse by State and City officials in the acquisition of those documents); and, to perform the mathematical analysis to interconnect such evidence, to discover that these algorithms not only were used to defile our U.S. Senate Republican Primary election in Massachusetts but also are used to manipulate elections across the United States of

3

America.  Our findings show similar patterns of manipulation in Arizona, Georgia, and Michigan. However, the evidence in Massachusetts, specifically from Suffolk County, has enabled the calculation of the "weights" used to manipulate vote counts in the Massachusetts U.S. Senate Republican Primary.

I find it ironic and somewhat embarrassing that as a scientist-technologist, the inventor of email, who earned four degrees from the Massachusetts Institute of Technology, and has dedicated nearly fifty years of my life to the advancement of technology, that I must now make a rather Luddite request to this Court for a hand count of the paper ballots cast in the Republican U.S. Senate Primary election.   Moreover, it is my unfortunate conclusion, that until these criminal software features are prohibited from all electronic voting systems, paper ballots should be used, and hand counted in a transparent manner.  An Order from this Court is now necessary to enforce the U.S. Supreme Court's ruling on the application of the Equal Protection Clause of the U.S. Constitution authored by Chief Justice Earl Warren in *Reynolds vs. Sims,* 377 U.S. 533 (1964), which served to clarify the constitutionally protected right to "One Person, One Vote." Only such an Order will clarify this right in the 21st century of electronic voting systems.


THIS IS PERSONAL

My name is Dr. Shiva Ayyadurai, and I am the son of Meenakshi and Ayyadurai; the grandson of Chinnathai and Vellayappa – poor village farmers; and, the great-grandson of Ganapathi – an indentured servant.

The principle of "One Person, One Vote" is deeply personal to my family and me.  It is perhaps the singular reason why my parents, on December 2, 1970 – on my seventh birthday – left the oppressive caste system of India, a system in which one's birth determined one's fate, and one in which low-caste untouchables such as us were considered less than human.

Therefore, when I read the *Three-Fifths compromise* of 1787, the Dred Scott case, the passage of the *Fourteenth Amendment* in 1868, and Chief Justice Earl Warren's ruling to clarify "One Person, One Vote," in AP American history class, it was more than just a reading assignment.   Those events defined America – the struggle of millions, who fought and died to push forward American suffrage, against incredibly reactionary forces of their time.

The *Three-fifths Compromise* had deemed a slave was three-fifths ("3/5ths") of a human being.  The unfortunate Dred Scott ruling reinforced the deplorable *Three-fifths Compromise* – that institutionalized an American caste system, where one human being was mathematically a fraction of another. In March 1857, the Supreme Court had issued a 7–2 decision against Dred Scott, an enslaved black man, ruling that black people "are not included, and were not intended to be included, under the word 'citizens' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States."

It was not until the *Fourteenth Amendment* (1868), that Article 1, Section 2, Clause 3 of the *Three-fifths Compromise* was superseded, and the compromise was explicitly repealed providing a path to the clarification of "One Person, One Vote."  The historic U.S. Supreme Court ruling on the application of the Equal Protection Clause of the U.S. Constitution authored by Chief Justice Earl Warren in *Reynolds vs. Sims,* 377 U.S. 533 (1964) did just that – it clarified "One Person, One Vote."

"In India, you would have been discriminated nine different ways, but in America, only three. However, if you work hard – three times harder – you can achieve anything," was my mother's rationale on why we came to America. That rationale reflected the fact that though the

realization of the American Dream was imperfect, the Constitution provided a flexible framework to support the movement forward for perfection of the American Dream.

My family's emigration from India precisely was because my parents wished their children to be raised in a country with the rule of law, and the principle of transparent elections that upheld the cherished principle of "One Person, One Vote," a country where they knew local political bosses could not and would not steal votes or subvert elections. That is the vision of this country that I too held until September 1, 2020, and that is the country this Court has an opportunity to return Massachusetts to, and to send a signal for all America that there should never be a compromise to "One Person, One Vote."

Perhaps, my spiritual tradition informs me that my role at this point in history is not mere coincidence. As a low-caste untouchable from India who experienced and observed the deep inequities of that caste system, was fortunate enough to receive incredible training across multiple fields of engineering and science, be a software developer for nearly fifty years, and then one who became a U.S. Senate candidate subjected to election fraud, I see it as my duty to expose what I believe is the singular issue that threatens our democracy in modern times: the weighted race feature in electronic voting systems, which enables a caste system and a return to a more ubiquitous Dred Scott, where regardless of race, everyone can be made "3/5ths" of a person. My analysis reveals that my voters and I were made to be "2/3rds" of a person, by a weighted race computer algorithm! This is deplorable and must be condemned by this court.

Massachusetts – the cradle of the American Revolution – is where patriots rose up against a system of caste, royalty, and oppression starting in 1774. This Affidavit presents this Federal court, in Massachusetts, with a new and historic opportunity – the opportunity to issue an Order to stop America's degeneration into another caste system.

THE REAL FIGHT AGAINST ELECTION FRAUD IN THE 21st CENTURY

I understand why many Courts may initially be skeptical of allegations of "election fraud." For most unbiased observers, the current discourse on election fraud, disseminated on mainstream and social media, must appear as a kind of reality show. On one side, stand those who do not believe in the existence of election fraud in America. These folks believe stealing elections only occurs in banana republics, in dictatorships in far off places like Pinochet's Chile, and in third-world countries of Brown, Yellow, Black folks; but, surely not here, in America – the land of the free, and the home of the brave.  On the other side, stand those who push allegation after allegation on the thievery of mail-in ballots, and tweet and post pictures of bags of ballots in dumpsters.   The latter includes those who misdirect people's attention away from the real issues of election fraud – the concern of this Affidavit – to concerns that do not address the primary issue; thus, ensuring that stories about election fraud end up in the Weird News section.

The conscious misdirection by promoters of this "fake" election fraud is designed to conceal the real source of 21st-century election fraud – ***the real crime scene*** – which is elsewhere, neither in dumpsters nor in mail-in ballots.  The real crime scene of election fraud is in the software of electronic voting systems, where the votes are electronically tabulated by software which enables a "weight" or factor – a fraction or decimal – to be applied, more specifically, multiplied, to a vote to ensure the final result does not reflect the choice of the people.  Such weighting of votes is the source of election fraud – the real threat to democracy – because it ensures that we no longer adhere to the fundamental principle of  "One Person, One Vote."

It is apparent to me that the current reality show fails to focus on this central aspect of the software that enables election fraud, and aims to distract us into Left and Right, in a partisan

fight.  But the true source of election fraud is non-partisan – the weighted race feature in the software of electronic voting systems.

### PATTERN RECOGNITION: THE SCIENCE OF SIGNAL DETECTION AND COMPUTATIONAL MODELING OF NORMAL AND ABNORMAL CONDITIONS

How does one detect election fraud?  The science of pattern recognition provides the foundation for such an effort.  My Curriculum Vitae, in Exhibit I, documents that I have been actively involved in the science and engineering of pattern recognition methodologies, which includes signal detection and computational modeling, for nearly fifty years.

As early as in 1978, at the age of 14, my career in the field began when I was recruited to work as a full-time Research Fellow at Rutgers Medical School where I not only created the world's first email system but also developed pattern recognition methods to detect normal and abnormal sleep patterns in babies with Sudden Infant Death Syndrome (S.I.D.S).  The presence of an abnormal sleep pattern typically occurred prior to the onset of apnea, when a baby stopped breathing. Therefore, signal detection of an abnormal sleep pattern could be used to alert parents and to save a baby's life.

From that time, be it beginning in high school as a Research Fellow or in academia at MIT, where I earned four degrees in multiple fields of engineering, performed scientific research, developed courses, and taught; or, in industry, in my various startups, the diverse consulting work I performed for Global 2000 enterprises, and business partnerships, the common thread prevalent consistently across all those endeavors was *pattern recognition*.

My expertise in Scientific Visualization, Computational Modeling, and Computer Operating Systems enabled me to develop pattern recognition methods for a range of problems: speech recognition, flow visualization, handwriting recognition, document analysis, face

recognition, ultrasonic analysis to detect flaws in bridges and aircraft wings, automatic email analysis for routing and response, and, more recently through my company CytoSolve, the computational framework to detect combinations of compounds that can alleviate or exacerbate disease.

It is because of this deep involvement in the field of pattern recognition – unlike a typical political candidate who becomes a victim of election fraud –  I am able to unravel and detect the systemic source of that fraud, and to clearly articulate the findings to this Court. The detection of election fraud is fundamentally a pattern recognition problem.  In this Affidavit, I will provide original research undertaken by myself, with the assistance of dedicated volunteers in Massachusetts and across America, to expose the pattern of election fraud in the 2020 Massachusetts U.S. Senate Republican Primary.

BEYOND REPUBLICAN AND DEMOCRAT – BEYOND LEFT AND RIGHT.

It is important this Court understands that for the majority of my life, I have never voted for either wing of the political establishment: Republican or Democrat.  Only in the past four years have I entered electoral politics, starting with my voting for Donald Trump in November of 2016.  Prior to that, I never voted for any candidate. In Donald Trump, I saw a disruptor, who was neither a "Republican" nor a "Democrat."

Concomitant to my pursuit of engineering and science, my interest in politics and desire to understand systems of oppression have always run in parallel.  I have been a lifelong student of political movements both theoretically as well as a ground activist.  By the age of 18, I came to realize that both major political parties, Republican and Democrat, were simply two wings of the establishment, particularly after I saw Jesse Jackson in the 1984 U.S. Presidential election give all of his votes to Walter Mondale, under the pretext of "lesser of two evils."

Since that time, I disengaged from any interest in electoral politics, but was a dedicated ground political activist on many fronts, be it leading demonstrations and protests to secure rights for MIT food service workers or to fight for policies to encourage entrance of more women, poor, and minorities to MIT. At my PhD graduation in 2007, I was the sole voice to protest against the war in Iraq.  When I went to India on my Fulbright research in 2008, and got recruited by the Indian government to run one of the leading research and development initiatives, I became a whistleblower when I exposed corruption and was forced to leave India under death threats.  Years later my allegations were shown to be true, I was vindicated and returned back to meet with Narendra Modi, the current Prime Minister of India.

In 2012, when documents of my work were submitted to the Smithsonian, clearly demonstrating I had invented the first email system as a 14-year-old boy in Newark, New Jersey, I had to endure a massive backlash of abuse from academic "historians" and click-baiting media such as Gawker media, who spread vitriol and defamed my reputation as a scientist and technologist.  I had to fight back not only for the truth of email's origin, but also, and more importantly, for the larger truth that innovation can occur, anytime, anyplace, by anybody.  It took me nearly four years to find an attorney to sue Gawker, and get justice.  Gawker media was punished in many ways. They were driven into bankruptcy. They were forced to remove the three defamatory articles against me. Gawker paid me a substantial sum to settle the matter.

In 2016, when Donald Trump ran for U.S. President, I observed in him someone who was willing to expose and disrupt the two-party establishment. I saw in him a fighter.  So, I registered as an Independent and voted for him.  After attending the inauguration of President Trump in 2017, I decided to run for Federal office for the first time, as an Independent for U.S. Senate against Senator Elizabeth Warren. I set about building a grassroots campaign of like-minded

Patriots, who too wished for this country to be as close to the shining vision it had been for centuries.  I garnered close to 100,000 votes as an Independent, which I understand was five times more than any U.S. Senate Independent candidate in Massachusetts history, in the midst of both parties colluding against our Independent run.

As an outsider, our campaign had to wage various battles with reactionary forces.  At one point I was punched in the face by a racist, who wore a t-shirt emblazoned with "LIBERAL," who disagreed with me – a brown-skinned person of Indian descent - calling Elizabeth Warren a racist.  I was successful in filing criminal charges and ensuring he received just punishment.  The City of Cambridge later attempted to violate my First Amendment rights regarding my campaign's slogan: "Only the Real Indian Could Defeat the Fake Indian." The City sent me notice demanding I remove the large banner carrying that slogan off my campaign bus, claiming it violated a building ordinance.  I sued in Federal court, and the City was forced to settle with me, and ceased violating my First Amendment rights.  In addition to such harassment, I also had to fight the establishment of both parties, who colluded to keep me off the debate stage. As a bona fide Independent candidate, I had every right to be on the debate stage.  Fearful of our campaign's anti-establishment policies and message galvanizing more voters if I were given access to mainstream media on debate night, the media organizations kept me illegally off the debate stage.  My campaign spent nearly 30% of our campaign funds, filing lawsuits that demonstrated that I had fulfilled all polling requirements, and should have been allowed on the debate stage.

In February 2019, I began my run for U.S Senate against incumbent Senator Edward Markey. I knew that I would have to win in the Primary, as this time I ran as a Republican candidate. Therefore, from February 2019 through August 2020 I ran a huge effort on the ground

in all 351 towns and cities of Massachusetts in order to build name recognition, connect with voters about the issues important to us, and get a large number of voters pledging to vote for us on Election Day – September 1, 2020.

In terms of sheer numbers, our campaign team – all volunteers – working people across Massachusetts and across America –  made nearly 500,000 phone calls, left nearly 5 million voice messages, received nearly 25,000 pledges to vote for us on Election Day, did approximately 500 standouts (where volunteers go to city centers and overpasses and hold signs for "Dr.SHIVA, MIT PhD for U.S. SENATE"), distributed 10,000 lawn signs and 20,000 bumper stickers, had large ads running on 10 major highway billboards, ran 30-minute and 60-minute network radio and television ads, and ran nearly 1 million ads on YouTube. Most importantly, the message of our campaign, "Truth Freedom Health," galvanized over 3,000 volunteers in Massachusetts as well as across the country.  Hundreds of our volunteers worked near full-time to advance our campaign. I travelled on my campaign bus to nearly 250 cities, attending rallies where hundreds would appear to support us.  Almost all of my campaign cash contributions were below $23.00, with a total of nearly $1.5 million.

In stark contrast to our dynamic campaign, my opponent, Kevin O'Connor, who was announced as the MassGOP's preferred candidate and enjoyed endorsement and fundraising by Governor Charles Baker, was near invisible across the 351 towns. I was unable to come across any lawn signs, bumper stickers, standouts or rallies by O'Connor throughout my extensive weekly campaign trips across Massachusetts. At best, he had a few hundred Twitter followers, and no ground visibility. According to the FEC, he raised around $460,000.

I was also very active on Twitter, as it was my main medium to connect with established supporters and potential voters. Over nine (9) years, I had grown my Twitter followers from zero

to around 300,000. My tweets were frequently re-tweeted in large numbers and received views in the hundreds of thousands to millions. Not once did Twitter suspend me and chill my voice throughout that period.

Our campaign strategy during this period was to garner 200,000 votes. Based on voting patterns across America, with the implementation of mail-in ballots, which gave a significant lift to voter participation, our conservative estimates predicted at least 325,000 voters would participate in the Republican Primary on Election Day.  In 2018, 260,000 people voted in the Republican Primary.  With mail-in ballots, we estimated that there would be at least an increase of 25% in that number – that's how we had arrived at our 325,000 estimate.

GALVIN'S ACTION ON AUGUST 31, 2020

Secretary of State Galvin issued an official statement on the evening of August 31, 2020, the day before the 2020 Republican Primary was held.  Galvin declared that the 2020 Primary season would set a new record for the number of participating voters of around 1.4 million.

Galvin declared that he expected 1.2 million voters to participate in the 2020 Democratic Primary.  But, Galvin predicted only 150,000 voters would participate in the 2020 Republican Primary election – 110,000 less than in 2018!

Galvin's prediction was frankly shocking. This 150,000 statement staggered my campaign and myself.  Per our estimates, across the country, data had predicted an increase in turnout of 25% to 200% from 2018, as it was a Presidential election year, there was increased interest because of President Trump, and because of mail-in ballots.  Our estimates were that at least 325,000 voters, conservatively a 25% increase from 2018, would vote in the Republican Primary.  Using that estimate, to win the election, our strategy was to get 200,000 votes to win in a massive landslide.  Since campaign theory historically predicts that there is a 1 to 10

conversion from pledges to voters, our team had worked hard to get nearly 22,000 actual confirmed pledges to vote for us.  From our estimates, we were on target to get 200,000 to 220,000 votes on Election Day.

Following Galvin's statement, we immediately held a midnight emergency meeting on the night of August 31 to go over Galvin's statement and compare it with our internal estimates. It is unrealistic to assume that the Secretary of State's office did not arrive at that same number - at least a minimum of 325,000 - beforehand.  This naturally raised the question of what malign interest compelled Galvin to deliberately claim a far lower number. The only reasonable conclusion is that Galvin was setting the stage for a massive manipulation of votes in the 2020 Republican Primary and wished to both reduce the number of votes received by me and convey the impression to the public that a low number of votes for me simply reflected lack of interest in the race.

SEPTEMBER 1, 2020
PRIMARY ELECTION NIGHT

All the way up until the close of polls, my team and I were campaigning on the ground.  My last campaign rally was in Danvers, Massachusetts.  Even the local head of the Republican party stopped by to say, "Shiva, you got this by a landslide!"  In fact, that word "landslide" was the most common word I heard as I travelled across Massachusetts in the final week of the campaign.

After the close of polls on September 1, 2020, Franklin County tracked my internal data and showed me defeating O'Connor by a ratio of 54/46.  This ratio was also the expected result per my internal data for all the other counties.

However, in all the other counties, the media declared that O'Connor had won by 60/40 nearly uniformly.  I investigated and learned that in Franklin County, approximately 70% of the

precincts had hand-counted paper ballots whereas in all other counties, the predominant method was the use of electronic voting systems.  It was at that point that I was forced to conclude that this massive anomaly, this pattern, suggested election fraud. It was a devastating epiphany for someone who had totally believed in the vision of the United States.

In fact, in my speech on the night of September 1, 2020, documented on Twitter, I tweeted out: "**Election Fraud** is occurring in **Third-World Massachusetts**. At least we STILL have the 2nd Amendment."   I did not concede the election.

SEPTEMBER 2, 2020 -  SEPTEMBER 25, 2020
OFFLINE AND ONLINE ACTIVITIES

Between September 2, 2020, and September 25, 2020, my core volunteers and I embarked on a crash course in learning about data manipulation using electronic voting systems, Weighted Race algorithms, and ballot images; put together a mathematical and actuarial analytical team; conferred with transparency activists across the U.S. for the first time; filed numerous public record requests under MGL ch. 66 with State and City election officials; and tweeted my educational journey to my supporters on Twitter through dozens of tweets all marked with the "#ElectionFraud" hash tag.

Not only did I not concede to Mr. O'Connor, but also I escalated our campaign to a massive WRITE-IN campaign across Massachusetts for the general election.  We proceeded to hand out 1.5 million business cards with the front side that stated "Dr.SHIVA for U.S. SENATE" and the slogan "#StopElectionFraud," and the back side with instructions on how one could write in "Dr.SHIVA" on a paper ballot.   Our campaign took out approximately six billboard ads on major highways, added new radio and television ads, and took out more YouTube ads.

We also issued a very specific public records request to Defendant Galvin requesting ballot images, cast vote record (CVR) files, list of vote record (LVR), log files, and other data files. During this same period, I personally visited the offices of Secretary of State Galvin multiple times, following up on the public records request, and recorded state officials triumphantly informing me that I could not receive the ballot images because they don't save them. In fact, when I first visited the Secretary of State's office on September 9, 2020, election official Will Rosenberry, referring to the storage of ballot images, stated, "We turned any features like that off. I don't believe we are going to be able to provide you with any of these records," referring to my public records requests.

During this time, I tweeted prolifically about election fraud, the deletion of ballot images by the Secretary of State, and violation of Federal law if records, such as ballot images, are destroyed. Never did Twitter ban or force me to remove my tweets.

SEPTEMBER 25-26, 2020
DEFENDANT GALVIN RETALIATES FOR MY
EXPOSING HIS DESTRUCTION OF BALLOT IMAGES

On September 25, 2020, I received an official email from Michelle Tassinari, Massachusetts Elections Director and Legal Counsel to Defendant Galvin, that declared that electronic voting system vendors must agree to set their factory default setting for "Save Ballot Images" to OFF – meaning to destroy ballot images after they are generated from ballot scanning, in order for their machines to be certified for sale to Massachusetts precincts for use in both state and Federal elections. Manufacturers and vendors who refuse to change the settings to delete ballot images are banned from selling their machines in Massachusetts, per a direct order from Secretary of State Galvin. Tassinari, who is also Galvin's legal counsel, proved unable to claim one single statutory or regulatory authority for this order.

Not only is there no legitimate reason to coerce electronic voting systems to delete ballot images after they have been used to tabulate the Cast Vote Record, this edict consciously violates Federal law 52 U.S. Code 20701. Following my email interaction with Tassinari, I immediately posted screenshots of the Tassinari email conversation on Twitter and tweeted that Massachusetts destroyed ballots used in a Federal election, and had violated Federal law. For the first time ever, Twitter forced me to delete this tweet and then proceeded to suspend me from Twitter, also for the first time ever, even though I was still running for office in a U.S. Senate race and used my Twitter presence to connect with both followers and potential voters.  After I sued Galvin in Federal court, the injunction hearing on October 30, 2020, revealed that Tassinari is the President-elect of a group called the National Association of State Election Directors (NASED), that Galvin's office is an official "Twitter Partner" that is assured of a priority response from Twitter when Galvin complains about a tweet, that Galvin colluded with the NASED and the National Association of Secretaries of State (NASS) to induce Twitter to suspend me for twenty-one (21) of the final thirty-five (35) days prior to Election Day, November 3, 2020, and that Galvin was most concerned about the Tassinari email screenshot which confirmed that Galvin ordered the deliberate destruction of ballot images, which is in conscious violation of Federal law.

It is implausible for Galvin to now claim that he was unaware of the plain text and intent of a Federal Law that has remained unchanged throughout the twenty-five (25) years that Galvin has been the chief elections official for Massachusetts.  At the October 30, 2020, injunction hearing, Galvin agreed to cease and desist from making Twitter suspend me prior to Election Day 2020 and to desist from colluding with NASED to do so as well.  After I learned of the existence of NASED and the out-sized role it plays in the conduct of elections, I discovered that

even though it enjoys credibility as the official mouthpiece for state officials nationwide, it belongs to and is managed by a private not-for-profit in New York City called DemocracyWorks, Inc. that receives direct funding support from Kathryn and James Murdoch's Quadrivium Foundation, Rockefeller Brothers, the Pew Charitable Trusts, the MacArthur Foundation, and the Knight Foundation. NASED's current Executive Director, Amy Cohen, manages NASED after working within Democracy Works and originally worked for Pew.

After the 2016 elections, Amy Cohen "left" her position at the Pew Charitable Trusts and co-founded an NGO named Center for Election Innovation and Research (CEIR). See https://electionlawblog.org/?p=86274 Cohen was the registered agent and it was incorporated using her home address.

CEIR has pursued two goals: (1) push states to become participants in the Electronic Registration Information Center (ERIC) voter database that was set up by Pew, and (2) push local election officials to stop the use of decentralized counting of votes at precincts in favor of centralized vote tabulation centers. CEIR's main "innovation" is incentivizing local election officials to centralize the tabulation of digital ballot images by claiming a cost saving of $15,000 per county after centralization. Centralizing the hitherto decentralized tabulation of ballots allows for the easy transmission of large numbers of digital ballot data to distant back-offices away from local eyes, where large numbers of votes can be weighted and flipped from one candidate to another through the use of software algorithms such as Weighted Race, without having to deploy a large visible number of software personnel to each individual precinct or county to fiddle with the data locally. The data travels to the vote flippers instead. And the locals have no idea that this happens at all, let alone know what security protocols are employed to secure their vote and who all can access it in a different state or country. In September 2020, Facebook

founder Mark Zuckerberg and his wife, Priscilla Chan, handed $50 MILLION to CEIR (*estd. 2016*) to assist its "innovative" work prior to and during the 2020 elections.

Cohen's position as Executive Director for the official voice of state election directors for the entire United States has given her great legitimacy and a powerful position from which to push for centralization of vote tabulation.

OCTOBER 2020
COLLECTING DATA IN THE FACE OF CONCERTED OBSTRUCTION

Throughout October, I was engaged in a daily struggle to obtain raw electronic data from election officials such as participating voters lists, as well as higher level CVR data.  Our volunteers issued approximately fifteen (15) different public records request to various towns and cities for the Republican Primary.  Officials of the City of Boston – the city with the largest likely voter turnout –  stonewalled me for a whole month, knowing that I needed the data to file a successful appeal of the Primary result.

On October 2, 2020, I finally had to take seventeen (17) of my supporters to Boston City Hall and demand that the City follow State law and hand over the data, right there and then, of the participating voters list and ballots cast.  Approximately twenty police officers arrived to keep the peace, and it became an extraordinary scene, which attracted the attention of Boston Mayor Martin Walsh. The City handed over the electronic data within twenty minutes.  This data from Boston as well as data from six (6) other towns/cities, and voting data from all counties across Massachusetts is analyzed below. Separate from all this, we had painstakingly compiled all the election results and demographics into our databases for analysis.  This was no small task.

THERE ARE MORE VOTES THAN VOTERS

It is assumed in the United States of America that we have "One Person, One Vote."   However, with the use of electronic voting systems, this is not guaranteed. If P number of voters cast their vote, we expect V number of votes.



Most of us believe that P will equal V assuming that what goes into the Voting System, as illustrated in the above diagram, will not be manipulated in any manner; however, it is documented in the technical manuals of electronic voting machine software that a "weighted race" feature exists to multiply a voter's vote by a "weight" – a decimal value – that can be less than 1 or greater than 1.

Moreover, documentation exists, as early as in 2002, to show that the vote counts are stored as decimal values, not as integers. The existence of a "Weighted Race" feature built into electronic voting systems provides a mechanism to employ an algorithm, so, "One Person, DOES NOT Equal One Vote."  This means P will equal V if and only if the weights equal 1 ("one"); otherwise, the assumption that P equals V is false.

In the analysis of Suffolk County, using data provided by the Secretary of State of Massachusetts, William F. Galvin, there is unequivocal evidence of an algorithm that has been employed such that a fraction of my total votes was transferred from me to my opponent.

A review of the data for Boston we received from Boston City Hall, revealed that there were 4,114 more votes than participating voters, thus indicating the presence of anomalies that

required explanation.  In fact, in the six other cities, for which we got information from public records requests, there were always more votes than voters. The table chart below summarizes the results. In Column one is the name of the city/town.  In the second column is the number of voters (P) who voted. In the third column is the number of votes (V) cast.  Finally, the last column shows the results: MORE VOTES, THAN VOTERS.

**Massachusetts US Primary Senate Races September 1, 2020**

| City/Town | Number of Participating Voters | Number of Votes Cast | Number of Excess Ballots |
|---|---|---|---|
| BOSTON | 142,911 | 147,025 | 4,114 |
| LAWRENCE | 8,811 | 8,886 | 75 |
| NEW BEDFORD | 8,914 | 13,725 | 4,811 |
| PLYMOUTH | 15,902 | 16,356 | 454 |
| NEWTON | 30,284 | 32,064 | 1,780 |
| BARNSTABLE | 13,675 | 13,734 | 59 |
| ROCKLAND | 1,644 | 3,931 | 2,287 |

ANALYSIS OF REPORTED VOTING DATA FROM SUFFOLK COUNTY
REVEALS A PATTERN WITH A PROBABILITY OF 1 IN 100,000

In early November, we were finally in a position to analyze the data.   Given Boston, the largest city with the largest voter turnout, is in Suffolk County, we began by analyzing Suffolk County. First, I created a histogram chart, below, of my votes across all precincts in Suffolk County.



Each "bin" on the x-axis indicates the number of votes.  The y-axis is used to denote, using the height of the bar, the number of precincts that contain that many number of votes.  So, by way of example, the bin denoted with "3" on the x-axis, with a bar with a height of approximately 27, indicates there are 27 precincts in Suffolk County in which I received 3 votes each. The table chart below highlights each incidence of  "High-Low" pairs for the first 22 bins for my votes by precinct in Suffolk County.  Note, there are 9 such pairs, out of a total of 11 possible.

| | Shiva | |
|---|---|---|
| Bin | Frequency | |
| 1 | 26 | HIGH |
| 2 | 10 | LOW |
| 3 | 28 | HIGH |
| 4 | 10 | LOW |
| 5 | 19 | HIGH |
| 6 | 12 | LOW |
| 7 | 9 | |
| 8 | 11 | |
| 9 | 11 | |
| 10 | 9 | |
| 11 | 13 | HIGH |
| 12 | 6 | LOW |
| 13 | 11 | HIGH |
| 14 | 5 | LOW |
| 15 | 11 | HIGH |
| 16 | 6 | LOW |
| 17 | 14 | HIGH |
| 18 | 6 | LOW |
| 19 | 7 | HIGH |
| 20 | 3 | LOW |
| 21 | 8 | HIGH |
| 22 | 4 | LOW |

I created the corresponding histogram chart and table for Kevin O'Connor. The chart is below:



The corresponding table is as follows:

In Kevin O'Connor's histogram and corresponding table chart, the incidence of "High-Low" pairs is much less pronounced, and the distribution is far more random than in my

| | KOC | |
|---|---|---|
| Bin | Frequency | |
| 1 | 22 | HIGH |
| 2 | 9 | LOW |
| 3 | 11 | |
| 4 | 17 | |
| 5 | 13 | |
| 6 | 9 | |
| 7 | 11 | |
| 8 | 14 | |
| 9 | 7 | |
| 10 | 9 | |
| 11 | 2 | |
| 12 | 6 | |
| 13 | 5 | |
| 14 | 6 | |
| 15 | 3 | |
| 16 | 1 | |
| 17 | 4 | |
| 18 | 8 | |
| 19 | 3 | |
| 20 | 6 | |
| 21 | 6 | |

distribution of votes.

The question herein is how likely is it that my vote count in Suffolk County could generate 9 or more "High-Low" pairs for the first 11 pairs in the histogram, assuming the reported results are fair and unbiased. To answer this question, I have modeled vote counts by precinct and candidate using a binomial distribution – of 298 precincts x 2 candidates for 596 total distributions.  This was used to produce a stochastic model for which I ran 100,000 iterations for Suffolk County.  To calibrate the model, I compared the average vote results – from the simulation – across those 100,000 iterations for the Republican Primary – with the actual reported results for the Republican Primary, from Secretary Galvin.   The two results were near the same. The reported results for actual vote for Suffolk County are 10,596.  The average vote results from my simulation are 10,597.  These results are summarized in the top part of the table chart below:

| Select Number of Iterations: | | | 100,000 |
|---|---|---|---|
| **100,000 Trials - Suffolk County** | | | |
| | Shiva | KOC | Total |
| Simulated Average | 4,247 | 6,350 | 10,597 |
| Actual | 4,245 | 6,351 | 10,596 |
| *High-Low Incidence for Bins 1 through 22* | | | |
| *Model Simulations Results for Shiva Only* | | | |
| **High-Low** | | **Cumulative** | |
| **Incidence** | **Frequency** | **Frequency** | **Cumul %** |
| 0 | 2,268 | 2,268 | 2.3% |
| 1 | 9,643 | 11,911 | 11.9% |
| 2 | 18,863 | 30,774 | 30.8% |
| 3 | 23,799 | 54,573 | 54.6% |
| 4 | 20,998 | 75,571 | 75.6% |
| 5 | 13,894 | 89,465 | 89.5% |
| 6 | 7,028 | 96,493 | 96.5% |
| 7 | 2,637 | 99,130 | 99.1% |
| 8 | 709 | 99,839 | 99.8% |
| 9 | 139 | 99,978 | 100.0% |
| 10 | 21 | 99,999 | 100.0% |
| 11 | 1 | 100,000 | 100.0% |
| **Total** | **100,000** | | |
| **# 9 or Greater:** | | | **161** |
| **P(9 or Greater):** | | | **0.16%** |
| *1 in 621 event* | | | |

The bottom part of the table chart above shows the modeled incidence of "High-Low" pairs for the first 22 bins in the histogram.  Based on these results, the appearance of 9 or more

"High-Low" pairs in the histogram is fairly rare, occurring only 161 times in 100,000 iterations, or approximately 0.16% of the time.  Stated differently, 9 or more "High-Low" pairs should only appear in bins 1-22 of the histogram once in every 741 elections!  These results could be refined a bit by increasing the number of iterations to 250,000 or 500,000, but the overall "message" would not change.

However, in addition to the rare and anomalous stream of "High-Low" pairs in my reported voting results, what is even more non-random is the fact the occurrence of "High-Low" pairs in the frequency distribution was 1.50 or greater.  For example, if one considers the first "High-Low" pair in bin 1 and bin 2, the precincts counts are 26 to 10, respectively, for a ratio of 2.6.  Similarly, if we consider the next "High-Low" pair in bin 3 and bin 4, the precinct counts are 28 to 10, respectively, for a ratio of 2.8.  This anomaly is even more rare.

To calculate the probability of this anomaly, I re-ran the stochastic model, with the occurrence of "High-Low" pairs AND their ratios being 1.50 or greater. The model revealed that in 100,000 iterations, there was one occurrence of 9 "High-Low" pairs having a ratio of 1.50 or greater.  This pattern, to put it simply, would occur **only once in every 100,000 elections** – a probability of nearly 150 times less than the occurrence of just "High-Low" pairs, as in the first case analyzed.

| 100,000 Trials - Suffolk County | | | |
|---|---|---|---|
| | Shiva | KOC | Total |
| Simulated Average | 4,247 | 6,350 | 10,597 |
| Actual | 4,232 | 6,294 | 10,526 |

High-Low Incidence for Bins 1 through 22
High > 1.50 x Low
Model Simulations Results for Shiva Only

| High-Low Incidence | Frequency | Cumulative Frequency | Cumul % |
|---|---|---|---|
| 0 | 18,594 | 18,594 | 18.6% |
| 1 | 31,556 | 50,150 | 50.2% |
| 2 | 26,562 | 76,712 | 76.7% |
| 3 | 14,862 | 91,574 | 91.6% |
| 4 | 6,022 | 97,596 | 97.6% |
| 5 | 1,889 | 99,485 | 99.5% |
| 6 | 424 | 99,909 | 99.9% |
| 7 | 82 | 99,991 | 100.0% |
| 8 | 8 | 99,999 | 100.0% |
| 9 | 1 | 100,000 | 100.0% |
| 10 | 0 | 100,000 | 100.0% |
| 11 | 0 | 100,000 | 100.0% |
| Total | 100,000 | | |

| # Greater, with High > 1.5 x Low: | 1 |
|---|---|
| P(9 or Greater, with High > 1.5 x Low): | 0.0010% |
| 1 in 100,000 event | |

## THE WEIGHTED RACE ALGORITHM IS A DOCUMENTED FEATURE

The reported highly non-random, easily modeled vote count pattern in Suffolk County is so implausible that I am forced to conclude that an algorithm was used to derive the result. We already know that manufacturers of electronic voting systems include such algorithms as documented features in their software. As early as 2002, in the voting manual of Diebold, for example, the cover page of which is shown below, the feature was known as "Weighted Race."



GEMS

# GEMS 1.18
# User's Guide

**DIEBOLD**
ELECTION SYSTEMS

Revision 4.0
November 1, 2002

On page 2-126 of the Diebold manual, the Weighted Race feature is explicitly described:



Election results will list the race for Mayor three times on election results reports; the first instance reports results for all of Harrison, the second for Ward 1 only and the third for Ward 2 only.

The Shadowed race type is only present in the race list if at least one Shadow race has been defined. The Shadowed race does not allow any definition of ballot text or revision to the number to vote for under the Race tab, does allow voter group selection under the Options tab, and disables the Candidates tab.

### Weighted

*Weighted* races are tallied by weights, assigned from the voter registration system, and may be counted in Central Count vote centers only.

Bar codes are assigned by the voter registration system, containing encoded information identifying the voter, tags identifying races as well as weight values for every voter and every race.

The tag defined for each weighted race should correspond to the race tag in the voter registration system.

#### Race types

A weighted race has the same attributes as a candidacy, and other than being weighted, is counted in the same manner as candidacies. In order to configure a question as a weighted race, two candidates are defined as positive and negative values in a vote for one race.

Preference and endorsement races control weighted races in the same manner as candidacies.

#### Election results

Weighted results are reflected in the election results reports in candidate totals as well as votes cast, and results are reported with two decimal places. Likewise, weighted results are manually entered in decimal amounts. Note that totals are not verified when manually entering the results of weighted races.

Since GEMS does not contain weight information, it is not possible to perform verification of manually entered weighted results, so that it is critical that these results entered be verified independently both prior to and following manual entry.

#### Examples

Voters vote on two propositions in a weighted election, Proposition A and Proposition B. Three voters vote in the election, John Doe, Jane Doe, and Bill Smith. John Doe is defined in the voter registration system with weight 25 for Proposition A and 50 for Proposition B, Jane Doe with weights 33 and 45, and Bill Smith with weights 20 and 40, respectively for the two propositions.

The three voters then vote as follows:

| Race | Selection | Voters | Tallies | Total |
|------|-----------|--------|---------|-------|
| Proposition A | Yes | John Doe | 25 | |
| | | Jane Doe | 33 | 58 |
| | No | Bill Smith | 20 | 20 |
| Proposition B | Yes | Jane Doe | 45 | 45 |
| | No | John Doe | 50 | |
| | | Bill Smith | 40 | 90 |

#### 2.5.3.2.    District

Not all voters in a jurisdiction may vote on all races in an election.

For example, the city of Harrison consists of precincts Jackson and Lincoln. Voters in the precinct Jackson vote for Ward 1 City Councilor and voters in Lincoln vote for Ward 2 City Councilor. Therefore, not all voters in the election vote on both of these races.

The Weighted Race feature is specifically documented as shown below to be a known feature in which **"Weighted races are tallied by weights, assigned from the voter registration system, and may be counted in Central Count vote centers only."** This feature is known to all election officials, but not to the voting public.



Secretary of State Galvin, the chief election official in Massachusetts for the past twenty-five (25) years, cannot plausibly deny personal knowledge of the availability of such powerful algorithms that can be employed by election officials to ensure that "One Person, IS NOT One Vote." In the next section, using simple algebra, from the Suffolk County reported voting results data, I shall derive the actual weights applied to manipulate the Republican Primary.

"ONE PERSON, NOT ONE VOTE"
MY WEIGHTED RACE  - "**2/3rds**" OF A PERSON

The only way to produce the "High-Low" pair with a 1.50 or above ratio is to apply a weight of 0.666 to every vote I received, and 1.22 to every vote Kevin O'Connor received. Mathematically, there is no other way to reproduce the reported result.

29

One important observation of the reported results in Suffolk County is that the "High-Low" pair with ratio of 1.50 or above reflects that the number of odd numbers occurs twice as many times as even numbers.  Or, another way of understanding this is to recognize that half of the even numbers are redistributed into odd numbers.  The only way this can be accomplished is by multiplying my votes by 0.666, as shown below. The first column is the non-weighted ("De-Weighted") votes.  After application of the weight of 0.666 and making it a whole integer, we are able to reproduce the reported pattern, as shown in the table below.  In the case of O'Connor, a weight of approximately 1.22 matched his reported results.

| De-Weighted | Weight | Weighted |
|---|---|---|
| 1 | 0.666 | 0 |
| 2 | 0.666 | 1 |
| 3 | 0.666 | 1 |
| 4 | 0.666 | 2 |
| 5 | 0.666 | 3 |
| 6 | 0.666 | 3 |
| 7 | 0.666 | 4 |
| 8 | 0.666 | 5 |
| 9 | 0.666 | 5 |
| 10 | 0.666 | 6 |
| 11 | 0.666 | 7 |
| 12 | 0.666 | 7 |
| 13 | 0.666 | 8 |
| 14 | 0.666 | 9 |
| 15 | 0.666 | 9 |
| 16 | 0.666 | 10 |
| 17 | 0.666 | 11 |
| 18 | 0.666 | 11 |
| 19 | 0.666 | 12 |
| 20 | 0.666 | 13 |
| 21 | 0.666 | 13 |
| 22 | 0.666 | 14 |

DE-WEIGHTED REPUBLICAN PRIMARY RESULTS FOR SUFFOLK COUNTY

In the graph below, the solid blue line and the solid red line chart the cumulative vote totals reported for my opponent and me, respectively. The end points denote the reported percentage of votes. For example, my opponent received a reported 57.0% to my 38.1%. However, given that this reported result is a Weighted result, we can now calculate the De-

Weighted result for my opponent and me, which is shown as the dashed blue line and the dashed red line, respectively.

Once De-Weighting is performed, in Suffolk County, I would have received 52.5% and my opponent 43.0%. Similarly, such De-Weighting is done in the next section to all results across all other counties where predominantly electronic voting systems were used.



DE-WEIGHTED REPUBLICAN PRIMARY RESULTS FOR
ALL OTHER COUNTIES EXCEPT FRANKLIN COUNTY





















REPORTED RESULTS FOR FRANKLIN COUNTY

In Franklin County, the majority of votes are hand counted paper ballots.  The reported results

for Franklin County are as follows:



These reported results closely track with the De-Weighted results for all other counties.

SUMMARY RESULTS WITHOUT WEIGHTED RACE

The charts below provide summary of the Weighted Race, i.e. reported, and the De-Weighted

race, i.e. actual, results.

| County | Weighted (Reported) | | | |
|---|---|---|---|---|
| | KOC-R % | Shiva-R % | KOC-R Votes | Shiva-R Votes |
| Boston | 58.0% | 37.1% | 4,862 | 3,112 |
| Worchester | 59.8% | 37.6% | 3,041 | 1,911 |
| Barnstable | 60.1% | 35.5% | 11,174 | 6,601 |
| Bristol | 57.9% | 39.0% | 12,298 | 8,281 |
| Hampden | 56.3% | 40.4% | 11,184 | 8,030 |
| Hampshire | 55.8% | 41.8% | 2,717 | 2,037 |
| Essex | 57.6% | 39.0% | 18,479 | 12,511 |
| Plymouth | 61.6% | 35.5% | 16,508 | 9,501 |
| Berkshire | 58.4% | 37.5% | 11,579 | 7,440 |
| Middlesex | 57.5% | 39.8% | 31,257 | 21,634 |
| Norfolk | 61.8% | 34.6% | 20,064 | 11,241 |
| Suffolk | 57.0% | 38.1% | 6,351 | 4,245 |
| **Total** | 60.8% | 39.2% | 149,514 | 96,544 |

| County | De-Weighted | | | |
|---|---|---|---|---|
| | KOC-A % | Shiva-A % | KOC-A Votes | Shiva-A Votes |
| Boston | 44.0% | 51.5% | 3,985 | 4,666 |
| Worchester | 45.4% | 52.2% | 2,493 | 2,865 |
| Barnstable | 46.1% | 49.8% | 9,159 | 9,897 |
| Bristol | 48.1% | 48.6% | 9,838 | 9,937 |
| Hampden | 45.6% | 49.7% | 8,669 | 9,434 |
| Hampshire | 45.9% | 51.6% | 2,174 | 2,444 |
| Essex | 42.7% | 54.2% | 14,783 | 18,767 |
| Plymouth | 47.4% | 49.9% | 13,531 | 14,244 |
| Berkshire | 48.8% | 47.0% | 9,263 | 8,928 |
| Middlesex | 43.0% | 54.5% | 25,620 | 32,435 |
| Norfolk | 47.7% | 48.9% | 16,446 | 16,853 |
| Suffolk | 43.0% | 52.5% | 5,206 | 6,364 |
| **Total** | 47.0% | 53.0% | 121,167 | 136,834 |

As can be seen by these numbers, the average De-Weighted county results across

Massachusetts excluding Franklin County of 53% to 47%, closely track with the results from

Frankly County, which was 53% for me and 46% for my opponent.  This finding serves as internal validation for this court, meaning when this court orders a transparent hand count of the paper ballots in all counties that used electronic voting machines, the Court should expect to find the actual results in those counties matches the same result as in Franklin County.

IMPLICATION OF THE DE-WEIGHTED RESULTS

The **enormity** of the discoveries presented in my Affidavit leaves any reasonable person with only the certainty that Defendant William Francis Galvin, the top election official for Massachusetts for twenty-five (25) years non-stop, fully knew about the availability of powerful algorithms that can alter the wish of the voters; fully knew that the availability of the original ballot images would facilitate the recognition that Weighting has been applied to procure an altered result; and therefore consciously, willfully, deliberately ensured that ballot images would not be available to candidates or good governance auditors, in knowing violation of Federal law.

This obstruction by the keeper of the records serves only to misdirect the public regarding the nature of the manipulation their votes have been subject to and to keep concealed from them that in Massachusetts "One Person, IS NOT One Vote," and that a corrupt elite simply control the outcome of elections that the people pay for.

This court must view adversely every single act of obstruction by Defendant Galvin that kept the relevant data from me, my voters, and the people of Massachusetts. It is an undeniable fact that Galvin to this day still has not responded to my public records request for other data outside of electronic ballot images. Stonewalling me was intentional.

It is a horrendous case of misdirection to claim that I could have applied in September for a recount given that the only realistic outcome would have been Galvin simply repeating the same Weighted algorithm and producing the same false result. A simple analogy would be to

request a photograph from Galvin and him producing a Photoshopped picture each time and claiming it is the original, knowing that he himself has deleted the original, in order to conceal the fact that he himself Photoshopped that image.

## THE ELECTION RESULT IS UNVERIFIABLE
## BECAUSE GALVIN HAS DELETED THE RAW DATA

Because Galvin has deliberately ordered the deletion of the electronic ballot images, no simple recount of the reported electronic result is meaningful, as shown by the extensive mathematical analyses above.  Galvin is assured to apply again the Weight of 0.666 to my vote count, and the Weight of 1.22 to O'Connor's vote count and claim that the outcome did not change.

As noted above, only a hand count of the paper ballots will reveal the actual will of the people of Massachusetts and ensure that the representative who ascends to the post of Senator actually represents the choice of the voters.

Going by the mathematics, a hand count of the paper ballots is highly likely to return a result that closely approximates that found in Franklin County. This reality is why Galvin applied Weights and deleted the ballot images in the first place.

## CONCLUSION

Electronic voting systems have the capability to weight races such that the final tally does not reflect the choice of the voters. The whole aim of weighting is to ensure that in the United States the principle of "One Person, One Vote" no longer applies, and it is done covertly without informing the people that this cherished foundational principle has been subverted and discarded.

Weighting was used against me by Secretary of State William Francis Galvin in the 2020 Republican Primary election. My opponent, Kevin O'Connor, supported by Governor Charles Baker, thus did not need to campaign in order to win and, compared to me, did not campaign at

all, despite this being his first ever run for office. The only logical conclusion is that he already was aware that the fix would be put in. As a person who has now run two Senate campaigns and knows the effort and numbers that entails, Kevin O'Connor's lack of interest in actual campaigning has only now become apparent to me.

The mathematical analysis of the reported voting data reveals a mathematical probability of **1 in 100,000** that the final result occurred naturally and organically without the use of an electronic weighting algorithm.

Since September 1, 2020, I have been running on little sleep while trying to collect the data and perform the needed mathematical analyses. When I attempted to verify the actual electronic data for myself I was actively denied access to the actual ballot images. Galvin ordered the destruction of the raw ballot images precisely to block any independent audit of the official result. There is no legitimate purpose served by destruction of the ballot images.

Galvin intentionally set out to cover up his crime by submitting a consciously perjurious affidavit which claimed that his legal counsel and state election director, Michelle Tassinari, personally "confirmed" with the vendors of Imagecast and DS200 voting machines that their scanners did not create electronic ballot images during the September 1st Republican Primary and the November 3rd General Election. This claim is willfully perjurious and an undeniable fraud on the court. This rearguard action by Galvin, the Annie Dookhan of elections, to actually lie under oath to prevent a court-supervised hand count of the paper ballots, strongly supports the conclusion that his action to debase the weight of votes cast for the Plaintiff was intentional, discriminatory, premeditated, systemic, and not inadvertence, random, negligence or simple human error, thereby causing an injury of constitutional dimensions that requires extraordinary

relief from this court in the form of decertification of the 2020 U.S. Senate race and a court-supervised hand count of the paper ballots cast in the 2020 Republican primary.

The fraudulently procured election result must not be allowed to stand. There can be no waiver by this nation on the basis of timeliness, inconvenience, 'the public will lose confidence in the integrity of electronic voting,' and other minor quibbles, given the enormity of the fraud revealed here.

What I have revealed is a massive disgrace. If the election result is allowed to stand, the working people of America will no longer believe the official result of a single election going forward, and this country will no longer be the United States of America that my parents aspired to raise their children in.

The fraud revealed here tears the heart out of American democracy and breaks our promise to the world that we do things properly and treat our citizens' choice of representative as sacrosanct.

The collusion revealed between Galvin, Baker and O'Connor tarnishes the standing of the United States amongst the community of nations. They have degraded our great nation to the level of banana republics, and third-world dictatorships, where "One Person, IS NOT One Vote."

This country depends on this court to ensure a return to "One Person, One Vote."

Signed under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

_____

**Dr. Shiva Ayyadurai**
December 25, 2020                    Plaintiff, *pro se*
701 Concord Avenue
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com