US DISTRICT COURT FOR MASSACHUSETTS

| | | |
|---|---|---|
| Dr. SHIVA AYYADURAI, | ) | |
| Plaintiff, | ) | Case No. 1:20-CV-12080-MLW |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM F. GALVIN, | ) | |
| in his official capacity as | ) | |
| Secretary of State, | ) | |
| CHARLES D. BAKER | ) | |
| in his official capacity as | ) | |
| Governor of Massachusetts, | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF A MOTION FOR A PRELIMINARY INJUNCTION
ORDERING DECERTIFICATION OF THE 2020 U.S. SENATE RACE**

THE EXTRAORDINARY RELIEF OF DECERTIFICATION
AS WELL AS AN ORDER REQUIRING A HAND-COUNT OF PAPER BALLOTS
IS CONSTITUTIONALLY REQUIRED

Plaintiff Dr. Shiva Ayyadurai ("Dr. Shiva") presents un-rebutted mathematical evidence

demonstrating that computer algorithms for weighting votes were used in the 2020 U.S. Senate

Republican primary to debase – dilute – the vote of both Dr. Shiva and every person who voted

for him such that they were turned into 2/3rds of a person. This extraordinary violation of the

Equal Protection Clause as applied to the states via the 14th Amendment, which guarantees

**"One Person, One Vote,"** demands extraordinary relief from this court.  Plaintiff therefore

seeks an order to decertify the 2020 U.S. Senate race as well as a transparent hand count of the

paper ballots cast in the 2020 U.S. Senate primary race.  Defendant William F. Galvin

("Galvin"), the Secretary of State for Massachusetts, intentionally employed computer

algorithms to manufacture fraudulent results, which Defendant Charles D. Baker ("Baker"), the

Governor of Massachusetts, certified, though he had ample notice that the results were

unverifiable.  Defendant Galvin destroyed all digital *ballot images* in order to block a quick and easy way to confirm the use of computer algorithms.  The only way now to ascertain voters' choice is a hand count of the paper ballots cast. Only this remedy will restore the credibility of the election, and assure adherence to the principle of **"One Person, One Vote**."

Secretary William Francis Galvin has been sued in his official capacity under the exception carved out by the Court for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

The court must weigh four factors when deciding whether to grant injunctive relief:

(1) The likelihood of success on the merits;

(2) The potential for the movant to be irreparably harmed by denial of the relief;

(3) The balance of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted; and,

(4) The effect that granting relief will have on the public interest.


*Phillip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir., 1998), *Monsanto v. Geertson*, 561 U.S. 139 (2010), *Trump v. Hawaii*, 585 U.S. ___ (2018), *Arborjet, Inc. v. Rainbow Treecare*, 794 F.3d 168 (1st Cir. 2015), *Planned Parenthood League v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981)

These factors are easily met in this action.


1    Likelihood of success on the merits favors the Plaintiff

The facts of this case demonstrate that the Plaintiff here has a great likelihood of success on the merits. Plaintiff provides this court a sworn affidavit detailing mathematical analysis that proves Galvin's declared numbers for the September 2020 Republican primary race may be achieved

only if votes for the Plaintiff were multiplied by 0.666 and votes for his opponent were multiplied by 1.22. There is a **One-in-100,000 chance** that Galvin's declared numbers were the natural random organic result without the use of a computer algorithm to alter the voters' choice. Part of the mathematical data from the affidavit is summarized below.

First is a histogram chart of votes for the Plaintiff across all precincts in Suffolk County.



Each "Bin" on the x-axis indicates the number of votes. The y-axis is used to denote, using the height of the bar, the number of precincts that contain that many number of votes. So, by way of example, the bin denoted with "3" on the x-axis, with a bar with a height of approximately 27, indicates there are 27 precincts in Suffolk County in which Plaintiff received 3 votes each.

The table chart below highlights each incidence of  "High-Low" pairs for the first 22 bins for votes cast for the Plaintiff by precinct in Suffolk County.  Note, there are 9 such pairs, out of a total of 11 possible.

| | Shiva | |
|---|---|---|
| Bin | Frequency | |
| 1 | 26 | HIGH |
| 2 | 10 | LOW |
| 3 | 28 | HIGH |
| 4 | 10 | LOW |
| 5 | 19 | HIGH |
| 6 | 12 | LOW |
| 7 | 9 | |
| 8 | 11 | |
| 9 | 11 | |
| 10 | 9 | |
| 11 | 13 | HIGH |
| 12 | 6 | LOW |
| 13 | 11 | HIGH |
| 14 | 5 | LOW |
| 15 | 11 | HIGH |
| 16 | 6 | LOW |
| 17 | 14 | HIGH |
| 18 | 6 | LOW |
| 19 | 7 | HIGH |
| 20 | 3 | LOW |
| 21 | 8 | HIGH |
| 22 | 4 | LOW |

This is the corresponding histogram chart and table for Plaintiff's primary race opponent, Kevin O'Connor:



The corresponding table is as follows:

| KOC | |
|---|---|
| Bin | Frequency |
| 1 | 22 HIGH |
| 2 | 9 LOW |
| 3 | 11 |
| 4 | 17 |
| 5 | 13 |
| 6 | 9 |
| 7 | 11 |
| 8 | 14 |
| 9 | 7 |
| 10 | 9 |
| 11 | 2 |
| 12 | 6 |
| 13 | 5 |
| 14 | 6 |
| 15 | 3 |
| 16 | 1 |
| 17 | 4 |
| 18 | 8 |
| 19 | 3 |
| 20 | 6 |
| 21 | 6 |
| 22 | 9 |

In Kevin O'Connor's histogram and corresponding table chart, the incidence of "High-Low" pairs is much less pronounced, and the distribution is far more random than in the distribution of votes cast for the Plaintiff.

The question herein is how likely is it that Plaintiff's vote count in Suffolk County could generate 9 or more "High-Low" pairs for the first 22 bins in the histogram, assuming the reported results are fair and unbiased. To answer this question, Plaintiff modeled vote counts by precinct and candidate using a binomial distribution – of 298 precincts x 2 candidates for 596 total distributions. This was used to produce a stochastic model that then ran 100,000 iterations for Suffolk County.  To calibrate the model, Plaintiff compared the average vote results – from the simulation - across those 100,000 iterations for the Republican Primary – with the results for the Republican Primary reported by Secretary Galvin. The reported results for the actual vote for Suffolk County are 10,596. The average vote results from Plaintiff's simulation are 10,597. The two results were near the same, demonstrating that the model is accurate.

These results are summarized in the top part of the table chart below:

| Select Number of Iterations: | | | 100,000 |
|---|---|---|---|

| | | *100,000 Trials - Suffolk County* | | |
|---|---|---|---|---|
| | **Shiva** | **KOC** | **Total** |
| **Simulated Average** | 4,247 | 6,350 | 10,597 |
| **Actual** | 4,245 | 6,351 | 10,596 |

*High-Low Incidence for Bins 1 through 22*
*Model Simulations Results for Shiva Only*

| **High-Low Incidence** | **Frequency** | **Cumulative Frequency** | **Cumul %** |
|---|---|---|---|
| 0 | 2,268 | 2,268 | 2.3% |
| 1 | 9,643 | 11,911 | 11.9% |
| 2 | 18,863 | 30,774 | 30.8% |
| 3 | 23,799 | 54,573 | 54.6% |
| 4 | 20,998 | 75,571 | 75.6% |
| 5 | 13,894 | 89,465 | 89.5% |
| 6 | 7,028 | 96,493 | 96.5% |
| 7 | 2,637 | 99,130 | 99.1% |
| 8 | 709 | 99,839 | 99.8% |
| 9 | 139 | 99,978 | 100.0% |
| 10 | 21 | 99,999 | 100.0% |
| 11 | 1 | 100,000 | 100.0% |
| **Total** | **100,000** | | |

| # 9 or Greater: | 161 |
|---|---|
| P(9 or Greater): | 0.16% |
| *1 in 621 event* | |

The bottom part of the table chart above shows the modeled incidence of "High-Low" pairs for the first 22 bins in the histogram representing reported votes for the Plaintiff. Based on these results, the appearance of 9 or more "High-Low" pairs in the histogram is fairly rare, occurring only 161 times in 100,000 iterations, or approximately 0.16% of the time. Stated differently, 9 or more "High-Low" pairs should appear in bins 1-22 of the histogram **only once in every 621 elections**! These results could be refined a bit by increasing the number of iterations to 250,000 or 500,000, but the overall "message" would not change.

However, in addition to the rare and anomalous stream of "High-Low" pairs in the reported vote results for the Plaintiff, what is even more non-random is the fact that the

occurrence of "High-Low" pairs in the frequency distribution was 1.50 or greater.  For example,

if one considers the first "High-Low" pair in bin 1 and bin 2, the precincts counts are 26 to 10,

respectively, for a ratio of 2.6.  Similarly, if we consider the next "High-Low" pair in bin 3 and

bin 4, the precinct counts are 28 to 10, respectively, for a ratio of 2.8.  This anomaly is even

rarer.  To calculate the probability of this anomaly, Plaintiff re-ran the stochastic model, with the

occurrence of "High-Low" pairs AND their ratios being 1.50 or greater. The model revealed that

in 100,000 iterations, there was one occurrence of 9 "High-Low" pairs having a ratio of 1.50 or

greater.  This pattern, to put it simply, would occur **only once in every 100,000 elections** – a

probability of nearly 150 times lower than the occurrence of just "High-Low" pairs, as in the first

case analyzed.

| 100,000 Trials - Suffolk County | | | | |
|---|---|---|---|---|
| | | Shiva | KOC | Total |
| Simulated Average | | 4,247 | 6,350 | 10,597 |
| Actual | | 4,232 | 6,294 | 10,526 |
| *High-Low Incidence for Bins 1 through 22* | | | | |
| *High > 1.50 x Low* | | | | |
| *Model Simulations Results for Shiva Only* | | | | |
| High-Low | | | Cumulative | |
| Incidence | | Frequency | Frequency | Cumul % |
| 0 | | 18,594 | 18,594 | 18.6% |
| 1 | | 31,556 | 50,150 | 50.2% |
| 2 | | 26,562 | 76,712 | 76.7% |
| 3 | | 14,862 | 91,574 | 91.6% |
| 4 | | 6,022 | 97,596 | 97.6% |
| 5 | | 1,889 | 99,485 | 99.5% |
| 6 | | 424 | 99,909 | 99.9% |
| 7 | | 82 | 99,991 | 100.0% |
| 8 | | 8 | 99,999 | 100.0% |
| 9 | | 1 | 100,000 | 100.0% |
| 10 | | 0 | 100,000 | 100.0% |
| 11 | | 0 | 100,000 | 100.0% |
| | Total | 100,000 | | |
| # Greater, with High > 1.5 x Low: | | 1 | | |
| P(9 or Greater, with High > 1.5 x Low): | | 0.0010% | | |
| *1 in 100,000 event* | | | | |

One important observation of the reported results in Suffolk County is that the "High-Low" pair with ratio of 1.50 or above reflects that the number of odd numbers occurs twice as many times as even numbers. Another way of understanding this is to recognize that half of the even numbers are redistributed into odd numbers. The only way this can be accomplished is by multiplying votes for the Plaintiff by 0.666, as shown below. The first column is the non-weighted ("De-Weighted") votes. After application of the weight of 0.666 and making it a whole integer, we are able to reproduce the reported pattern, as shown in the table below.  In the case of O'Connor, a weight of approximately 1.22 matched his reported results.

| De-Weighted | Weight | Weighted |
|---|---|---|
| 1 | 0.666 | 0 |
| 2 | 0.666 | 1 |
| 3 | 0.666 | 1 |
| 4 | 0.666 | 2 |
| 5 | 0.666 | 3 |
| 6 | 0.666 | 3 |
| 7 | 0.666 | 4 |
| 8 | 0.666 | 5 |
| 9 | 0.666 | 5 |
| 10 | 0.666 | 6 |
| 11 | 0.666 | 7 |
| 12 | 0.666 | 7 |
| 13 | 0.666 | 8 |
| 14 | 0.666 | 9 |
| 15 | 0.666 | 9 |
| 16 | 0.666 | 10 |
| 17 | 0.666 | 11 |
| 18 | 0.666 | 11 |
| 19 | 0.666 | 12 |
| 20 | 0.666 | 13 |
| 21 | 0.666 | 13 |
| 22 | 0.666 | 14 |

The only way to produce a "High-Low" pair with a 1.50 or above ratio is to apply a weight of 0.666 to every vote that Plaintiff received, and 1.22 to every vote that Kevin O'Connor received. Mathematically, there is no other way to reproduce the reported result.

This mathematical data remains un-rebutted to this minute. Reducing Plaintiff and all those who voted for him to the status of **2/3rds persons** violated their right to Equal Protection and provides him with a federal cause of action via 42 U.S.C § 1983 that requires the

extraordinary relief of decertification from this court. The reported result must not be allowed to stand. *Reynolds v. Sims*, 377 U.S. 533 (1963), *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978)

In the graph below, the solid blue line and the solid red line, chart the cumulated vote totals reported for Kevin O'Connor and the Plaintiff, respectively. The end points denote the reported percentage of votes. For example, O'Connor received a reported 57.0% to Plaintiff's 38.1%. However, given that this reported result is a Weighted result, we can now calculate the De-Weighted result for O'Connor and the Plaintiff, which is shown as the dashed blue line and the dashed red line, respectively.

Once De-Weighting is performed to reverse the debasement by Galvin of votes cast for the Plaintiff, in Suffolk County, Plaintiff would have received 52.5% and O'Connor 43.0%.



This process is further detailed in the mathematical affidavit for all counties that used electronic voting systems with tabulation of digital ballot images and application of Weighting algorithms by Galvin. Franklin county, which is mostly paper-based, serves as the control for comparison. The charts below provide a summary of the Weighted Race i.e. reported results from Galvin versus the De-Weighted race i.e. actual results that reflect the un-debased choice of the voters.

| County | Weighted (Reported) | | | |
|---|---|---|---|---|
| | KOC-R % | Shiva-R % | KOC-R Votes | Shiva-R Votes |
| Boston | 58.0% | 37.1% | 4,862 | 3,112 |
| Worchester | 59.8% | 37.6% | 3,041 | 1,911 |
| Barnstable | 60.1% | 35.5% | 11,174 | 6,601 |
| Bristol | 57.9% | 39.0% | 12,298 | 8,281 |
| Hampden | 56.3% | 40.4% | 11,184 | 8,030 |
| Hampshire | 55.8% | 41.8% | 2,717 | 2,037 |
| Essex | 57.6% | 39.0% | 18,479 | 12,511 |
| Plymouth | 61.6% | 35.5% | 16,508 | 9,501 |
| Berkshire | 58.4% | 37.5% | 11,579 | 7,440 |
| Middlesex | 57.5% | 39.8% | 31,257 | 21,634 |
| Norfolk | 61.8% | 34.6% | 20,064 | 11,241 |
| Suffolk | 57.0% | 38.1% | 6,351 | 4,245 |
| **Total** | 60.8% | 39.2% | 149,514 | 96,544 |

| County | De-Weighted | | | |
|---|---|---|---|---|
| | KOC-A % | Shiva-A % | KOC-A Votes | Shiva-A Votes |
| Boston | 44.0% | 51.5% | 3,985 | 4,666 |
| Worchester | 45.4% | 52.2% | 2,493 | 2,865 |
| Barnstable | 46.1% | 49.8% | 9,159 | 9,897 |
| Bristol | 48.1% | 48.6% | 9,838 | 9,937 |
| Hampden | 45.6% | 49.7% | 8,669 | 9,434 |
| Hampshire | 45.9% | 51.6% | 2,174 | 2,444 |
| Essex | 42.7% | 54.2% | 14,783 | 18,767 |
| Plymouth | 47.4% | 49.9% | 13,531 | 14,244 |
| Berkshire | 48.8% | 47.0% | 9,263 | 8,928 |
| Middlesex | 43.0% | 54.5% | 25,620 | 32,435 |
| Norfolk | 47.7% | 48.9% | 16,446 | 16,853 |
| Suffolk | 43.0% | 52.5% | 5,206 | 6,364 |
| **Total** | 47.0% | 53.0% | 121,167 | 136,834 |

As can be seen from these numbers, the average De-Weighted county results across Massachusetts (excluding Franklin County) of 53% to 47%, closely track with the results from Frankly County, which was 53% for Plaintiff and 46% for my O'Connor. This finding serves as internal validation for this court, meaning when this court orders a transparent supervised hand count of the paper ballots in all counties that used electronic voting machines, the court should expect to find the actual result in those counties matches the result seen in Franklin County.

It is important to note that the algorithmic intervention applies to votes cast in fully 83% of cities and towns in Massachusetts.

In order to prevent Galvin's (*Zuckerberg's?*) malign intent from being established as the state's certified election result, and the voters coerced into accepting a representative whom they did not vote for, decertification of the 2020 US Senate race result is required as is a transparent hand count of all the paper ballots cast, beginning with the September 2020 Republican primary race. This remedy is unavoidable and constitutionally required. The US 1st Circuit Court of Appeals ruled in *Griffin* that even a fresh primary election was necessary to ensure the binding principle that the voters' choice must be respected and reflected in the choice of their representative.

> "While the "outcome" test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted [citations omitted], it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for its lack of integrity. . . . Here, the closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted." *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978)

> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harman v. Forssenius*, 380 U.S. 528, 537 (1965)

In our case here, the mathematical analysis reveals that a paper recount is highly likely to lead to a "retroactive invalidation of a potentially controlling number of votes cast" in the 2020 Republican primary. A **One-in-100,000 chance** that Galvin's declared result was without intentional debasement of the weight of votes cast for the Plaintiff (and the vote cast by himself), meets the definition of extraordinary. An extraordinary remedy is required.

> "We agree with Judge Tuttle that in debasing the weight of appellants' votes the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit."

*Wesberry v. Sanders*, 376 U.S. 1 (1964)

No court should endorse Galvin turning U.S. citizens into 2/3rds persons. Our elections must not be bought and paid for. That is not who we are as a country.

Galvin intentionally set out to cover up his crime by submitting a consciously perjurious affidavit which claimed that his legal counsel and state election director, Michelle Tassinari, personally "confirmed" with the vendors of Imagecast and DS200 voting machines that their scanners did not create electronic ballot images during the September 1st Republican Primary and the November 3rd General Election. This claim is staggering, totally unbelievable and deliberately willfully perjurious. This claim is an undeniable fraud on the court.

> "Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals...Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions setup to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society...The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."
> *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)

This rearguard action by Galvin, the Annie Dookhan of elections, to actually lie under oath to prevent a court-supervised hand count of the paper ballots, strongly supports the conclusion that his action to debase the weight of votes cast for the Plaintiff was intentional, discriminatory, premeditated, systemic, and not inadvertence, random, negligence or simple human error. This, under *Griffin*, makes decertification and a paper count mandatory, followed by a fresh special election.

It is binding precedent in this circuit, *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), that a fresh general election is necessary to ensure the binding principle that the voters' choice must be respected and reflected in the choice of their representative for U.S. Senate.

"While the "outcome" test provides a sensible guideline for determining when federal judicial invalidation of an election might be warranted [citations omitted], it is not a principle requiring mathematical certainty. In cases of outrageous racial discrimination some courts have chosen not to apply it at all, but to invalidate the election simply for its lack of integrity. . . . Here, the closeness of the election was such that, given the retroactive invalidation of a potentially controlling number of the votes cast, a new primary was warranted."

The 3rd Circuit ruled in its thoughtful and comprehensive decision in *Marks v. Stinson*,

19 F.3d 873 (3d Cir. 1994):

"The integrity of the election process lies at the heart of any republic. The people, the ultimate source of governmental power, delegate to their elected representatives the authority to take measures which affect their welfare in a multitude of important ways. When a representative exercises that authority under circumstances where the electors have no assurance that he or she was the choice of the plurality of the electors, the legitimacy of the governmental actions taken is suspect. Accordingly, where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated power. See, e.g., *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967)."

All the Circuits as well as the US Supreme Court are united on this bedrock principle.

"Undeniably, the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, *Ex parte Yarbrough*, 110 U.S. 651 [4 S.Ct. 152, 28 L.Ed. 274], and to have their votes counted, *United States v. Mosley*, 238 U.S. 383 [35 S.Ct. 904, 59 L.Ed. 1355]."

*Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377-78, 12 L.Ed.2d 506 (1963)

The Plaintiff has been consciously and willfully harmed by Secretary Galvin and Governor Baker, through conscious abuse of their official status and powers, and is assured of succeeding on the merits of his claim. The mathematical certainty of Plaintiff's claim itself is beyond mere argument and exceeds the required plausibility standard. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Iannacchino v. Ford Motor*, 451 Mass. 623 (2008)

2      <u>This political candidate has already been irreparably harmed</u>

"These voting rights are potentially violated, however, whenever an individual is sworn in as an elected representative without a demonstration that he or she was the choice of a plurality of the electorate. This is so because the possibility is left open that some other candidate actually received more votes than the declared winner, which would mean that each of the votes cast for this other candidate was ignored." *Marks*, supra, citing *Griffin*

That **_public demonstration_** is impossible without a hand-count of the paper ballots because Galvin has intentionally destroyed the electronic ballot images that were used to tabulate the electronic vote count.

There is another vital point here that Galvin has never revealed to this court.

Electronic voting systems are **_not_** untouched by human hands, even before any algorithm is used to manipulate the vote count. When paper ballots are scanned in and the machine creates a digital ballot image, the machine then triages the ballot images to determine if they are ballots that qualify for machine processing, meaning they are complete, have marks in the expected locations, have no marks in unexpected locations and the choice of the voter is clear. After triaging, the machine creates two sets of ballot images: the images that are clear to the machine and the images that need adjudication by human officials before tabulation. For example, if 100 images are created and the machine determines that 50 are clear for immediate tabulation and 50 need human adjudication, the clear 50 votes are added by the machine to the tabulation count while the other 50 await human adjudication. This involves transferring those 50 images from the precinct machine to the central tabulation center where the humans are, usually with a thumb drive.

Galvin has repeatedly asserted under oath that no images were ever created or stored, meaning none was transferred from the machines to anywhere else in a thumb drive.

**What this then means is that ballots determined by the precinct machines to require human adjudication were <u>simply discarded!</u>**

Here is a further important point about how many ballots are discarded: machines can be programmed to discard a certain percentage of ballot images by altering the error rate. It is easy to program machines to discard 30% of ballot images based on how the oval for a certain candidate was filled in by the voter. Setting a low error rate would allow in more votes for a certain candidate without human adjudication and a high error rate would let in fewer votes for a certain candidate without human adjudication.

Given that the Plaintiff has mathematically proved that Galvin used a computer algorithm to manipulate the count and debase the weight of votes cast for the Plaintiff, it is mandatory to examine the possibility that a high error rate was programmed into the machines, upon Galvin's orders, only for ballots that were cast for the Plaintiff, such that they were set aside for human adjudication, which then never happened.

Given that the MassGOP openly supported Plaintiff's opponent in the primary in order to present a weakling to run against Markey in the general election, it would be mendacious to claim that GOP observers at the central tabulation site would have objected.

The demonstrated unreliability of the declared result for the Republican primary naturally also casts doubt on the reliability of the result for the Democratic primary and ultimately the reliability of the 2020 U.S. Senate race. Decertification is unavoidable.

Defendant Baker must be ordered by this court to decertify the 2020 U.S. Senate race. Defendant Galvin must be ordered by this court, as the only remedy possible, to arrange a transparent court-supervised hand-count of the paper ballots from the September 2020 Republican primary election.

No other choice passes Constitutional muster as the Plaintiff here, one of two candidates in the Republican primary race, has already been harmed in all areas that reported an electronic vote count and has assuredly been cheated out of an election, as have his voters.

3       Defendants Galvin and Baker face no harm from an order of decertification

Galvin faces no harm whatsoever from being required by this court to further refrain from abusing his office to consciously violate bedrock Constitutional principles as well as Supreme Court rulings and 1st Circuit rulings. Galvin is already required by his oath of office to ensure a transparent ***public demonstration*** that the certified result is a true reflection of the people's choice and that all votes were counted fully. Mathematical evidence is overwhelming that without a paper ballot count that is impossible. Galvin's pointed factual misrepresentations to this court, including a consciously perjurious affidavit which claimed that his legal counsel and Massachusetts State Election Director, Michelle Tassinari, "personally confirmed" with the vendors of Imagecast and DS200 voting machines that their scanners did not create electronic ballot images during the September 1st Republican Primary and the November 3rd General Election, is further evidence that he is trying to keep massive algorithm fraud concealed (*Nothing to see here Your Honor, move along now*). *Ergo*, a paper ballot count is mandatory.

If Galvin actually cares about bedrock American principles, and that "all votes must be counted," he would not oppose this order at all. But he does oppose it! Again, no voluminous briefing is required for this court to follow hornbook law.

Galvin has intentionally lied to this court in order to obstruct justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) This court may not reward a person with

unclean hands. Galvin's "tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions setup to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238 (1944) "Strong medicine is required to cure the Defendant's disrespect for the law." *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2000)

The decertification order must issue. As detailed below in a separate section, two decertifications did not harm the Governor of New Hampshire in 1974 in the Wyman-Durkin case. One decertification now is certainly not going to harm Governor Baker in any way.

4      The requested injunction is in the public interest

It is in the public interest to uphold the rule of law and require elected officials to stop abusing their office in order to throw an election and ignore the people's votes. It is in the public interest to publicly demonstrate that the certified vote count reflects the true choice of the electors.

"The integrity of the election process lies at the heart of any republic. The people, the ultimate source of governmental power, delegate to their elected representatives the authority to take measures which affect their welfare in a multitude of important ways. When a representative exercises that authority under circumstances where the electors have no assurance that he or she was the choice of the plurality of the electors, the legitimacy of the governmental actions taken is suspect. Accordingly, where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated power." *Marks*, supra, citing *Griffin*

This has been required of all courts from the time of *Reynolds v. Sims*, 377 U.S. 533 (1963) through to *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) and *Evenwel v. Abbott*, 578 U.S __(2016)

CERTIFICATION BY THE GOVERNOR IS NOT FINAL AND DOES NOT OVERRIDE THE
PLAINTIFF'S RIGHT TO EQUAL PROTECTION UNDER THE CONSTITUTION

Galvin has provided this court with a copy of the certificate signed by Governor Baker which

states that Edward Markey is the state's selection to occupy a seat in the U.S. Senate. Galvin

claims that this action, certification, is final, '***set in stone***' as it were, and ***automatically*** deprives

this court of jurisdiction itself.

Galvin, the Chief Election Officer for Massachusetts for 25 years now, fully knew that

was a false statement when he peddled it to this court. Galvin is aware, as are all persons

conversant with polling history for the U.S. Senate, including laypersons not in political office,

that certification by the Governor is easily reversed and has been done so on many occasions.

Plaintiff reminds this court of the events surrounding the 1974 race for U.S. Senate

conducted in New Hampshire. Republican Louis Wyman ran against Democrat John Durkin for

the seat previously occupied by Norris Cotton, who chose to retire. Initially Wyman was certified

by the Governor as the next Senator. After a recount Wyman was decertified and the Governor

certified Durkin. After a second tabulation, Durkin was decertified and the Governor certified

Wyman. *Wyman v. Durkin*, 115 N.H. 1, 330 A.2d 778 (1975) Finally the U.S. Senate declared

the seat vacant and a fresh special election was held.

https://www.senate.gov/artandhistory/history/minute/Closest_election_in_Senate_history.htm

The 1974 Senate race holds the record for the closest Senate race ever, dragged on for

eight full months, ***and involved not just one but two decertifications***. It beggars belief that a

professional election official of 25 years standing did not remember this famous fact prior to

peddling his false claim to this court. And we are talking about events from 1974, not 1874, and

in next door New Hampshire, not in far off Idaho, at the time that a young Galvin already was

immersed in politics. In 1972, Galvin was an aide to the **Governor's Council** himself and fully

versed in the legal ins and outs of certification. And in 1975, right around the time of the famous Wyman-Durkin controversy with its two certifications and two decertifications, he won his first special election as Representative to the Massachusetts State House from Allston-Brighton. It stretches credulity to claim that Galvin would have personally forgotten such a seminal event from his early days in politics.

In addition, when not just innocent errors in transparent paper ballot tabulation, as in the 1974 New Hampshire vote, but active intentional fraud has been shown via mathematical analyses in a sworn affidavit, **mere certification by the Governor means nothing *per se***. The U.S. 1st Circuit Court of Appeals ruled in *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) that a fresh primary election was necessary to ensure the binding principle that the voters' choice must be respected and reflected in the choice of their representative. This *stare decisis* has been cited by sister circuits.

> "Accordingly, where there is substantial wrongdoing in an election, the effects of which are not capable of quantification but which render the apparent result an unreliable indicium of the will of the electorate, courts have frequently declined to allow the apparent winner to exercise the delegated power."
> *Marks v. Stinson*, 19 F.3d 873 (3d Cir. 1994)

Thus, as a matter of fact and law, mere certification by the Governor does not deprive this court of jurisdiction or the power to order remedies. There is no bar whatsoever to decertification of the 2020 U.S. Senate race in Massachusetts by this court. Federal courts have a "virtually unflagging obligation" to rule on the merits of cases properly before them. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. ___ (2013) (**unanimous**), *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 US 350 (1989), *England v. Medical Examiners*, 375 U.S. 411 (1964) Given the overwhelming and un-rebutted mathematical evidence that the weight of votes cast for the Plaintiff has been debased by Galvin, that Galvin's

denial of equal protection was intentional, purposeful, systemic and state-wide and not an "isolated error or negligence" in the slightest, and that Galvin willfully engaged in conscious factual misrepresentations in order to cover up his intentional violation, decertification is this court's duty. *Lemon v. Kurtzman*, 411 U.S. 192 (1973)(In shaping equity decrees, the trial court is vested with broad discretionary power), *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967)(In this vital area of vindication of precious constitutional rights [involving voting]...if affirmative relief is essential, the court has the power and should employ it)

CONCLUSION

As detailed above, in order to comply with the Constitution, Supreme Court rulings and 1st Circuit precedent, the requested decertification must be ordered, accompanied by an order requiring a public, court-supervised hand-count of the paper ballots cast in the September 2020 Republican primary election.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

December 25, 2020

**Dr. Shiva Ayyadurai**
Plaintiff, *pro se*
701 Concord Avenue
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com

CERTIFICATE OF SERVICE

Plaintiff certifies that he served this motion upon Defendant Galvin via counsel Adam Hornstine via ECF, and will serve upon Defendant Baker via the Sheriff.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

Date: December 25, 2020

**Dr. Shiva Ayyadurai**
701 Concord Avenue
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com

CERTIFICATE OF CONFERRAL PER L.R. 7.1

Plaintiff certifies that he conferred with counsel Adam Hornstine regarding this motion for decertification and was informed that Defendant Galvin opposes a court-supervised hand count of paper ballots..

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

Date: December 25, 2020

**Dr. Shiva Ayyadurai**
Plaintiff, *pro se*
701 Concord Avenue
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com