UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DR. SHIVA AYYADURAI,

Plaintiff,

v.

WILLIAM FRANCIS GALVIN, in his official
capacity as the Secretary of the Commonwealth
of Massachusetts, and CHARLES D. BAKER, in
his official capacity as Governor of Massachusetts

Defendants.

CIVIL ACTION
NO. 1:20-cv-12080-MLW

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
ORDERING DECERTIFICATION OF THE 2020 U.S. SENATE RACE**

MAURA HEALEY
ATTORNEY GENERAL

Anne Sterman (BBO No. 650426)
Adam Hornstine (BBO No. 666296)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2048
Anne.Sterman@mass.gov
Adam.Hornstine@mass.gov

Dated: January 8, 2021

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..........................................................................................................1

FACTUAL BACKGROUND ......................................................................................2

ARGUMENT .............................................................................................................6

I.      STANDARD OF REVIEW. ..............................................................................6

II.     PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM............7

          A.     Plaintiff's Lacks Standing to Bring a Vote Dilution Claim Under the Equal Protection Clause of the Fourteenth Amendment...................... 7

          B.     Plaintiff's Claim is Moot Because the Election Results Have Been Certified. ................................................................................................ 9

          C.     The Eleventh Amendment Bars This Suit. ............................................... 10

          D.     The Doctrine of Laches Justifies Denial of the Requested Injunction. ............................................................................................... 12

          E.     Plaintiff's Claim of Vote Manipulation is Unsupported by Fact or Law. .................................................................................................. 13

III.    PLAINTIFF MAKES NO SHOWING OF IRREPARABLE HARM. .............................17

IV.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST, AND THE EQUITIES DO NOT FAVOR PLAINTIFF...............................................................................17

CONCLUSION.......................................................................................................... 20

## INTRODUCTION

Massachusetts conducts safe, fair, transparent, and free elections.  All voters who cast valid ballots have their votes publicly counted, and every vote counts equally.  After all votes are counted, winners are declared.  The machines that are used to count these votes are all publicly tested before the election, and election results are audited afterward.  As an added check, state law affords any candidate the ability to seek a recount or to notice a ballot contest within a defined timeframe.  This entire process exists not only to ensure accuracy in election results but also to secure the public's faith in the Commonwealth's election system.  "One person, one vote" is not an empty shibboleth for the officials, including the Defendants, charged with conducting elections in Massachusetts; it is the bedrock of republican governance.  All votes count.  All votes count equally.  Whoever has the most votes wins the election.  This is how elections work in the Commonwealth and how democracy works across the country.

Plaintiff Shiva Ayyadurai comes to this Court peddling dangerously anti-democratic and evidence-free conspiracy theories to deny the reality that he lost two elections fair-and-square – his party's nomination for United States Senate and the general election as a write-in candidate.  His ask of this Court is breathtaking: to disenfranchise the 3.6 million Massachusetts voters who participated in two elections amidst a global pandemic, to temporarily strip Massachusetts of half its representation in the United States Senate, to re-count all votes from two elections conducted months ago, and to have two new elections held.  This motion seeks to subvert the will of the voters while sowing baseless doubts in the electoral system.  He makes this request even though he twice chose not to seek a recount or notice a ballot contest under state law.

The Court should deny Plaintiff's request because it is entirely without legal support or

1

factual basis, relying only on incendiary and baseless personal attacks, pseudoscientific nonsense, and chatroom conspiracies that have been debunked and rejected by Courts across America in the wake of the 2020 election cycle.  Specifically, this motion for preliminary injunctive relief should be rejected because: (1) Plaintiff lacks standing to assert a claim for vote dilution; (2) Plaintiff's request is moot because the election results have now been certified; (3) Plaintiff's claim is barred by the Eleventh Amendment; (4) Plaintiff's equitable claim is barred by the doctrine of laches; (5) Plaintiff's fact-free claim about vote manipulation and ballot destruction is wrong; and (6) the balance of equities tips in the Commonwealth's favor because Plaintiff delayed in bringing this claim, even though he had mechanisms available to him under state law to seek a recount and because Plaintiff's motion seeks to subvert the voters' choice.

The First Circuit long ago cautioned federal courts to avoid meddling in the "machinery" of vote counting by the state by getting involved with such disputes.  See Griffin v. Burns, 570 F.2d 1065, 1077 (1st Cir. 1978).  This case – and the tragic events of recent days by vote-deniers – proves the wisdom of that advice.  This Court should not silence the will of the voters based on nothing more than untimely conspiracy theories and uninformed junk science, just as Courts across the country have uniformly rejected similar baseless suits by dissatisfied candidates and voters in the wake of the 2020 elections.  Plaintiff's motion should be denied.

## FACTUAL BACKGROUND

### Plaintiff's Allegations

Plaintiff ran unsuccessfully for the Republican party's nomination for U.S. Senate in the September 1, 2020 Massachusetts primary election.  Amended Complaint (hereinafter "Am. Cplt."), pp. 20-21.  Following his loss in the primary election, which Plaintiff alleges was contrary to his internal polling that showed him leading in all counties in the Commonwealth, Plaintiff's campaign submitted public records requests in various cities and towns across the

Commonwealth seeking the list of voters who participated in the primary in each of those cities and towns.  Id.  Plaintiff alleges that in all of the seven cities/towns that provided data in response to his campaign's request, the number of tabulated votes exceeded the number of voters shown to have voted.  Id.  Based on his alleged engineering and mathematical expertise – and without any admissible evidentiary support – Plaintiff allegedly determined that his votes had been multiplied by a factor of approximately 0.666, and his opponent's votes had been multiplied by a factor of approximately 1.22.  Am. Cplt., p. 28;  Plaintiff's Memorandum of Law in Support of a Motion for Preliminary Injunction Ordering Decertification of the 2020 U.S. Senate Race (hereinafter "Pl. Memo."), pp. 2-3.  He alleges that this "weighting" of votes was done by Secretary Galvin with malign intent and under the influence of a cast of characters ranging from two individuals who worked for various non-profit organizations to Mark Zuckerberg, creator of Facebook, and his wife, Priscilla Chan.  Am. Cplt., pp. 7-9; Pl. Memo., p. 11.

 He further alleges that the electronic tabulation equipment used by many municipalities creates ballot images, but that the Secretary's office has confirmed that it deleted those ballot images in violation of federal law and "in order to block a quick and easy way to confirm the use of computer algorithms."  Pl. Memo., p. 2.  As a result, he alleges that the paper ballots from his September 1, 2020 primary must be hand audited and re-counted, and he asks this court to de-certify the results of the November 3, 2020 election (and, presumably, the September 1 primary) and order that hand audit to proceed.  Pl. Memo., p. 2.  The reality, however, is far more simple than Ayyadurai's logical leaps and attempts at mathematical sleight of hand would suggest.

**<u>Voting Machines in Massachusetts Elections</u>**

The admissible evidence in the preliminary record instead shows that every voter in Massachusetts state and federal elections marks a paper ballot, whether by hand or by use of

special adaptive equipment used by disabled voters, and those paper ballots are the official vote cast by that voter.  Affidavit of Michelle K. Tassinari (hereinafter "Tassinari Aff."), ¶ 4.  Paper ballots are the official record of votes cast in Massachusetts elections, and they are stored by municipalities for 22 months after a federal election in accordance with federal law.  Id. Municipalities in Massachusetts tabulate the votes recorded on those paper ballots in one of two ways: by hand-counting, or by use of an electronic tabulator.  Tassinari Aff., ¶ 5.  No ballot images are generated, and no weighted calculation function is used.  Tassinari Aff., ¶¶ 6, 8, 9. All properly-cast votes are counted and all votes are weighted equally.  Tassinari Aff., ¶¶ 6, 9.

Pursuant to state law, the Secretary's office is charged with certifying equipment used in Massachusetts elections, and only equipment so certified may be used.  Mass. Gen. Laws. ch. 54, § 37; 950 CMR 50.00.  In order to obtain certification by the Secretary's office, equipment must be submitted for an office demonstration and used successfully in two field tests.  Tassinari Aff., ¶ 6.  During the office demonstration, staff from the Secretary's Elections Division mark multiple ballots, tally those votes by hand, deposit them into the tabulator, and then compare the hand count to the machine count for accuracy and to ensure there are no anomalies.  Id.

Only four electronic tabulator machines are certified for use in Massachusetts elections: two types of optical scanning machines (AccuVote and Optech), and two types of digital scanning machines (ImageCast and DS200).  Tassinari Aff., ¶ 7.  Optical scanning machines are not capable of making, storing, or transmitting images of ballots; they simply scan paper ballots for marked vote indicators and tabulate those vote indicators.  Id.  Digital scanning machines have the technological capability to make and store images, but the Secretary's certification of those machines for use in Massachusetts elections is conditioned upon those functions being disabled.  Id.  With this functionality turned off, the digital scanners operated similarly to the

optical scanners by reading the vote indicators marked on the paper ballot.  Id.  The Secretary's office confirmed with the vendors of those machines that the scanning functionality was disabled for both the September 1 primary and the November 3 general election.  Tassinari Aff., ¶ 8.  Therefore, no voting equipment used in Massachusetts creates or stores ballot images.  Id.  Voting equipment used in Massachusetts elections must meet not only the Secretary's certifications standards but also federal standards, which are certified by an independent testing lab, that require recording each vote precisely as indicated by the voter and producing an accurate report of all votes cast, without "weighting" votes.  Tassinari Aff., ¶ 9.

By regulation, all voting machines used in Massachusetts elections are tested before every election.  Tassinari Aff., ¶ 10.  The testing requires local election officials to mark at least 50 ballots for each precinct (in a primary, they must mark at least 50 ballots per party per precinct), which must be hand counted and then deposited into the tabulator.  Id.  The results of the hand count are then compared to the results of the machine count.  Id.  This testing process is performed in public and notice is posted at least 3 days in advance.  Id.  If the testing process reveals any problems, including tabulation errors or mechanical failures, the local election officials must report those errors to the Secretary's office.  Id.  No such reports were made to the Secretary's office for either the September 1 primary or the November 3 general election.  Id.

**2020 Post-Election Audit**

In addition to the testing and certification process for tabulators, the accuracy and integrity of Massachusetts general election results are tested by a post-election audit as required by Mass. Gen. Laws ch. 54, § 109A.  This audit is performed by conducting a public, non-computerized, random drawing to select 3% of precincts statewide to hand count ballots and compare those results to the previously-calculated results.  Id.; 2020 Post-Election Audit Report

Narrative, http://sec.state.ma.us/ele/elepostelection/2020-Audit-Report-Narrative.pdf, November 23, 2020, p. 1.  That drawing must occur within 48 hours of the close of polls on Election Day. Id. This year, that drawing took place on November 5, 2020.  2020 Post-Election Audit Report Narrative, p. 1; Tassinari Aff., ¶ 12.  As required by law, the selected precincts hand counted their ballots for offices of Electors for President and Vice President, Senator in Congress, Representative in Congress, Senator in General Court, and Representative in General Court, as well as one of the state-wide ballot questions.  Id.  A post-election audit report was published containing the results of the audit.  Id.  Overall, the audit found that in 47 of the 66 audited precincts, there was no change in the number of ballots cast; in the remaining precincts, the small disparities found were attributed to tabulator jams and/or poll worker error.  Id. at 2.  Relevant to Plaintiff's claims, this year's audit resulted in candidate Markey receiving an additional 81 votes, candidate O'Connor receiving 28 fewer votes, and Plaintiff receiving 88 additional votes.  Id. The report noted that:

> The number of votes reported on Election Night as "All Others" was reduced by 60 and the blank votes were reduced by 81. It is likely that write-in candidate SHIVA AYYADURAI gained additional votes during the audit that were on ballots not segregated by the tabulator because voters did not fill in the vote indicator next to the write-in space, and poll workers failed to categorize write-in votes for the candidate separately from "All Others."

Id.

## ARGUMENT

### I.    STANDARD OF REVIEW.

The Court should deny the motion for injunctive relief because Plaintiff fails to carry his substantial burden to demonstrate an entitlement to the "extraordinary and drastic remedy" he seeks.  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (noting that a "preliminary injunction is an 'extraordinary and drastic remedy'") (citation

6

omitted).  A preliminary injunction "is never awarded as of right."  <u>Munaf v. Geren</u>, 553 U.S.

674, 690 (2008).  Plaintiff must establish that he is likely to succeed on the merits, that he is

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

tips in his favor, and that an injunction is in the public interest.  See <u>Díaz-Carrasquillo v. García-</u>

<u>Padilla</u>, 750 F.3d 7, 10 (1st Cir. 2014) (outlining four elements for consideration of motion for

preliminary injunction).  The last two factors "merge when the Government is the opposing

party."  <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009).  Because Plaintiff cannot carry his substantial

burden to make a "clear showing," <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997), that he is

entitled to preliminary injunctive relief, his motion should be denied.

## II.     PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIM.

### A.     Plaintiff Lacks Standing to Bring a Vote Dilution Claim Under the Equal Protection Clause of the Fourteenth Amendment.

Plaintiff's amended complaint asserts a claim under the Fourteenth Amendment's Equal

Protection Clause, claiming that the method by which the state counted ballots violated the

Constitution's principle of one person, one vote.[1]  But Plaintiff's arguments that his votes were

weighted or otherwise destroyed, thus diluting the influence of these votes, does not vest him

with standing to press this claim in federal court because the remedy he seeks would not redress

his alleged injury but would needlessly disenfranchise all Massachusetts voters.

Under Article III of the United States Constitution, federal courts can resolve only

"cases" and "controversies."  U.S. Const. art. III § 2.  The case-or-controversy requirement is

satisfied only where a plaintiff has standing to bring suit.  See <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct.

---

[1]     Plaintiff has abandoned his claim that Defendants should be held civilly liable for alleged violations of federal criminal statutes, 52 U.S.C. §§ 20701-20702, because these laws do not provide him with a private right of action.  <u>See</u> <u>Cok v. Cosentino</u>, 876 F.2d 1, 2 (1st Cir. 1989) (noting that criminal civil rights statutes "do not give rise to a civil action for damages").

1540, 1547 (2016).  To establish standing, a plaintiff must show that: (1) he has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly ... trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-62 (1992) (internal quotation marks and citations omitted).  Here, even if Plaintiff can establish injury-in-fact and causation, he cannot clear the hurdle of redressability.

He specifically fails to establish that the alleged injury suffered by his supporters can be redressed by a decision from this Court undoing the prior two elections.  An order decertifying the votes of approximately 3.6 million Massachusetts voters would not reverse the dilution of Plaintiff's supporters' votes; it would instead disenfranchise all Massachusetts voters.  As one Court recently held, the alleged injury of vote dilution cannot be "remedied by denying millions of others their right to vote."  King v. Whitmer, No. CV 20-13134, 2020 WL 7134198, at *9 (E.D. Mich. Dec. 7, 2020); Bowyer v. Ducey, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *6 (D. Ariz. Dec. 9, 2020) ("even if Plaintiffs could somehow establish that their vote dilution claim was more than a generalized grievance to the point of asserting an injury, Plaintiffs have not established that the Court can redress this grievance.  To give Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that voted in the 2020 General Election.  Under Plaintiffs' theory, this would transform all of the alleged diluted votes from being "diluted" to being destroyed.").[2]  The impossibility of Plaintiff's proposed remedy is underscored

---

[2] Nor would Plaintiff's supposed harm be redressed by permitting a federally-ordered recount to proceed before any election results were decertified.  Leaving aside the fact that (1) Plaintiff's motion seeks to decertify election results before any recount would be ordered and (2) Plaintiff, in any event, fails to demonstrate that he is entitled to such extraordinary relief, the alternative of
(footnote continued)

by his failure to avail himself of less drastic tools under state law, including a recount or an election contest. See Griffin, 570 F.2d at 1077 (Section 1983 claim for decertification of an election only can exist where facts "go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane"). Plaintiff thus possesses no standing to pursue his equal protection claim.

**B.    Plaintiff's Claim is Moot Because the Election Results Have Been Certified.**

Plaintiff seeks through his motion an injunction requiring that the United States Senate election results be decertified. But this request is tardy, and Plaintiff's claim is now moot. On November 25, 2020, the Governor's Council certified the results of this election, declaring that Senator Edward J. Markey had won the state's U.S. Senate election. Tassinari Aff., ¶ 13. Further, on November 30, 2020, the Governor signed a Certificate of Election, attested to by the Secretary, stating that Edward J. Markey was duly elected to the United States Senate. Id. That certificate was transmitted to the President of the Senate on December 1, 2020, in accordance with federal law and Senate Rules, and Senator Markey was sworn in without any objection in the United States Senate. Id. Where, as here, Plaintiff fails to identify an ongoing dispute that can be rectified by an injunction, his request for injunctive relief is moot and should be denied on this basis. This Court's jurisdiction under Article III extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1. A lawsuit becomes moot—and thus no longer a case or controversy subject to federal court jurisdiction—when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013)

---

counting all votes a second time beggars the point of what would potentially happen pursuant to Plaintiff's position after such a late-in-the-day recount: all votes would then be discarded. But as Courts have held, vote dilution is not remedied by disenfranchising all voters. Id.

("ACLU").  "Another way of putting this is that a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party."  Id.  To remain subject to federal court jurisdiction, "a dispute 'must be extant at all stages of review, not merely at the time the complaint is filed."  United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1537 (2018).  "This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved."  Genesis HealthCare Corp. v. Symczyk, 569 U.S. 66, 71 (2013).

Because the certification Plaintiff seeks to undo has already taken place, there is no ongoing or current dispute to be enjoined by this Court.  Other Courts have rejected similar post-election, post-certification suits as moot for this very reason.  See Bowyer, 2020 WL 7238261, at *11 (D. Ariz. Dec. 9, 2020) (rejecting post-election, post-certification suit as moot because "the Court cannot enjoin the transmission of the certified results because they have already been transmitted"); King, 2020 WL 7134198, at *6 (E.D. Mich. Dec. 7, 2020) (rejecting attempt to decertify election as moot); see also Wood v. Raffensperger, -- F.3d ---, 2020 WL 7094866, at *6 (11th Cir. Dec. 5, 2020) ("We cannot turn back the clock and create a world in which the 2020 election results are not certified....And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified.") (internal quotation marks and citations omitted).  The result here should be no different.

### C.    The Eleventh Amendment Bars This Suit.

Plaintiff is also unlikely to succeed on the merits of his suit because it is barred by the Eleventh Amendment.  The Eleventh Amendment provides that federal jurisdiction "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state."  U.S. Const. amend. XI.  The Supreme Court has held that "[t]he ultimate guarantee of the Eleventh Amendment is that non-consenting States may

not be sued by private individuals in federal court." Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); see also Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) ("It is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.... [T]his jurisdictional bar applies regardless of the nature of the relief sought.").

This Eleventh Amendment proscription is subject to a narrow exception recognized more than a century ago in Ex parte Young, 209 U.S. 123, 159–160 (1908). Federal courts can prospectively enjoin state officials from continuing to violate the U.S. Constitution or other federal law, "notwithstanding the absence of consent, waiver or evidence of congressional assertion of national hegemony." Rosie D. ex rel. John D. v. Swift, 310 F.3d 230, 234 (1st Cir. 2002) (citation omitted). But "the theory of Young has not been provided an expansive interpretation." Pennhurst, 465 U.S. at 102. In determining whether a suit falls within the narrow exception carved out in Ex parte Young, it is "the substance, rather than … the form of the relief sought" that matters. Papasan v. Allain, 478 U.S. 265, 278-79 (1986). The Ex parte Young doctrine only allows federal courts to exercise jurisdiction over a suit in which the private plaintiff alleges ongoing violations of federal law; suits that seek redress for past wrongs are still barred by the Eleventh Amendment. See id. at 277–78 (noting that "Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past."); Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 73 (1996) (stating that Ex parte Young permits suit against a state official to go forward where it seeks "only prospective injunctive relief in order to "end a continuing violation of federal law.") (emphasis added). Thus, in "determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only

11

conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002) (citation omitted). And even where the requested relief has only future impact on the state defendant, "[t]he pivotal question is whether the relief 'serves directly to bring to an end a present violation of federal law.'" Whalen v. Mass. Trial Court, 397 F.3d 19, 29 (1st Cir. 2005) (citation omitted).

This Court lacks jurisdiction over Plaintiff's injunctive claim because nowhere does he identify an ongoing course of conduct that would continue to deprive him of federally protected constitutional rights. See Hootstein v. Collins, 670 F. Supp. 2d 110, 114 (D. Mass. 2009) ("The Ex parte Young doctrine, then, only allows federal courts to exercise jurisdiction over a suit in which the plaintiff alleges ongoing violations of federal law; suits that seek redress of past wrongs are still barred by the Eleventh Amendment."). Again, federal Courts have rejected nearly identical election-related claims on this basis. See King, 2020 WL 7134198, at *5 (concluding Eleventh Amendment barred election-related suit where the alleged harm already occurred and thus there "is no continuing violation to enjoin"); Bowyer, 2020 WL 7238261, at *9 (rejecting suit on Eleventh Amendment grounds where "[t]he relief requested—compelling the Governor to decertify the election—similarly seeks to alter past conduct" and as such "Plaintiffs have not identified an ongoing violation to enjoin.").

**D.    The Doctrine of Laches Justifies Denial of the Requested Injunction.**

Plaintiff's motion should be denied because of his unreasonable delay. Motions for injunctive relief can be denied under the doctrine of laches. "Laches ... is an equitable doctrine which penalizes a litigant for negligent or wilful failure to assert his rights...." Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972). "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party

asserting the defense." Museum of Fine Arts, Bos. v. Seger-Thomschitz, 623 F.3d 1, 10 n. 9 (1st Cir. 2010) (quoting Costello v. United States, 365 U.S. 265, 282 (1961)).

Plaintiff's claim is premised on a situation that was known to him for months.  Plaintiff lost his primary election on September 1, 2020.  He could have sought a recount under state law or noticed an election contest under state law.  He did neither.  He opted to run as a write-in candidate in the November 3, 2020 general election.  He also lost that election.  Again, he did not seek a recount or notice an election contest.  Instead, he waited for months while the Commonwealth, in reliance on his decision not to challenge these election results, certified the winners of these elections.  Any alleged irregularities have long since been known.  Plaintiff exercised no diligence in pursuing these claims and should not be rewarded with a ruling that would prejudice the voters who participated in a fair, safe, and secure election.  As with similar claims brought across the country, this motion should be denied under the doctrine of laches. See King, 2020 WL 7134198, at *7 (rejecting election suit under doctrine of laches, noting that "[w]hile Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak."); Bowyer, 2020 WL 7238261, at *11 (rejecting post-election suit to upset election results under doctrine of laches); see also Benisek v. Lamone, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere.").

### E.    Plaintiff's Claim of Vote Manipulation is Unsupported by Fact or Law.

The extraordinary relief that Plaintiff seeks should not be granted for the additional reason that his evidence-free allegations of voter fraud perpetrated by manipulation of electronic ballot files is based upon fundamental misunderstandings and misrepresentations as to how votes are cast, tabulated, and stored in Massachusetts.  Simply put, Plaintiff is not entitled to

preliminary relief because he is unlikely to succeed in proving the merits of his claim.

Massachusetts did not destroy ballots or otherwise engage in mathematical manipulation of vote

results, as Plaintiff hypothesizes without any proof.  The primary and general elections were

safe, secure, and fair.  All votes were counted and counted the same.  This is fatal to a "one

person, one vote" claim under the Equal Protection Clause.  See Lyman v. Baker, 954 F.3d 351,

371 (1st Cir. 2020) (dismissing "one person, one vote" claim relating to winter-take-all Electoral

College allocation because "Massachusetts counts the votes, according each vote equal weight,

and then awards its electors to the party whose candidate wins the highest number of votes.").

Plaintiff lost his primary election and failed to win as a write-in candidate in the general election.

Having twice failed to avail himself of state law recount procedure, he cannot now achieve the

same result by making baseless allegations of vote-counting fraud in federal court.

Every voter in Massachusetts marked a paper ballot and those ballots are the official vote

cast by that voter.  Tassinari Aff., ¶ 4.  Paper ballots are stored by municipalities for 22 months

following each federal election in accordance with federal law.  Id.  Municipalities in

Massachusetts tabulate the votes recorded on those paper ballots in one of two ways: by hand-

counting, or by use of an electronic tabulator.  Tassinari Aff., ¶ 5.  No ballot images are

generated, and no weighted calculation function is used.  Tassinari Aff., ¶¶ 6, 8, 9.  All properly-

cast votes are counted, and all votes have the same weight.  Tassinari Aff., ¶ 6.

The electronic tabulators used in Massachusetts meet stringent federal and state

certification standards.  Tassinari Aff., ¶¶ 6, 9.  In Massachusetts, even the certified tabulators

that are capable of creating ballot images – which is not every type of tabulator used in

Massachusetts – must have that function disabled.  Tassinari Aff., ¶ 7.  The Secretary's Office

verified that any image scanning function was, in fact, disabled for both the September 1 primary

and November 3 general election.  <u>Tassinari Aff.</u>, ¶ 8.  Every type of approved tabulator was subjected to testing and a demonstration of accuracy before it was approved for use in Massachusetts.  <u>Tassinari Aff.</u>, ¶ 6.  Every tabulator across the Commonwealth was publicly tested to ensure that it calculated results consistent with a hand-count before both the September 1 primary and the November 3 general election.  <u>Tassinari Aff.</u>, ¶ 10.  Plaintiff's creative reverse-engineering and hypothetical conclusions from his misdirected mathematical calculations notwithstanding, there is no basis in fact for his contention that ballot images were created and deleted, nor is there any basis in fact for his contention that the results were altered by application of some weight multiplier, nor does he offer any explanation of why such shenanigans would not have been laid bare in the extensive public testing process.[3]

     Plaintiff's outlandish assertions are further belied by the results of the 2020 post-election audit, in which general election ballots from 3% of Massachusetts precincts, selected at random, were hand-counted.  As required by law, the selected precincts hand counted their ballots for offices of Electors for President and Vice President, Senator in Congress, Representative in Congress, Senator in General Court, and Representative in General Court, as well as one of the state-wide ballot questions.  <u>Tassinari Aff.</u>, ¶ 12.  A post-election audit report was published containing the results of the audit.  <u>See</u> https://www.sec.state.ma.us/ele/eleposelection/2020-Audit-Report-Narrative.pdf.  Overall, the audit found that in 47 of the 66 audited precincts, there was no change in the number of ballots cast; in the remaining precincts, the small disparities found were attributed to tabulator jams and/or poll worker error.  <u>Tassinari Aff.</u>, ¶ 12.  Relevant

---

[3]    To the extent Plaintiff speculates that election fraud must have occurred because his campaign's internal polling disagreed with the results of the primary election itself, this contention is logically flawed.  A campaign's polling results based on samples of the electorate do not equal votes cast by voters in an election.  Only the latter counts.

to Plaintiff's claims, this year's audit resulted in candidate Markey receiving an additional 81

votes, candidate O'Connor receiving 28 fewer votes, and Plaintiff receiving 88 additional votes.

Tassinari Aff., ¶ 12.  The report noted that:

> The number of votes reported on Election Night as "All Others" was reduced by
> 60 and the blank votes were reduced by 81. It is likely that write-in candidate
> SHIVA AYYADURAI gained additional votes during the audit that were on
> ballots not segregated by the tabulator because voters did not fill in the vote
> indicator next to the write-in space, and poll workers failed to categorize write-in
> votes for the candidate separately from "All Others."

Tassinari Aff., ¶ 12.  Notably, the audit results did not differ from the initial results in any

systemic or consistent basis that could be attributable to illegal tabulation methods such as the

use of weighted calculations.  Tassinari Aff., ¶ 12.  And Plaintiff offers no explanation for why

the mathematical engineering that he insists took place was not revealed by the audit.

In a further effort to discredit the tabulation of election results from the primary, Plaintiff

alleges that he received information from seven cities and towns indicating that the number of

voters who participated in the election and the number of votes cast did not match.  Am. Cplt., p.

21.  Specifically, he asserts that in all seven cities and towns the number of tabulated votes was

larger than the number of participating voters.  Id.  This disparity, he asserts, is explained by vote

manipulation in the form of mathematical weighting.  He offers no factual basis to support his

remarkable assertion that votes were altered in this manner, and none exists.  Plaintiff's contorted

mathematical computations ignore the simpler explanation for these numerical disparities: that at

the time he obtained the information, the relevant cities and towns had not completed the process

of updating the electronic records of who had voted based on the paper lists kept at polling

places, rendering the electronic records incomplete.[4]  Tassinari Aff., ¶¶ 14-16.  And there are

---

[4]      Plaintiff did not seek certified copies of voting records or the paper lists.

inevitably small disparities between these two numbers that are attributable to human error and/or election officials failing to record which ballot is taken by unenrolled voters.  Tassinari Aff., ¶ 15.  Wild, unsupported speculation as to multipliers that were applied cannot, without more, excuse Plaintiff's failure to pursue his state law remedy to seek a recount.

## III.    PLAINTIFF MAKES NO SHOWING OF IRREPARABLE HARM.

Plaintiff's motion fails to demonstrate that he will be irreparably harmed if it is denied. The election results have already been certified and have long been known.  There is no need to preserve the status quo, because the alleged harm that Plaintiff identifies – certification of the election results – has already come to pass.  Steir v. Girl Scouts of the USA, 383 F.3d 7, 16 (1st Cir. 2004) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.").

Plaintiff's delay in seeking this relief – and his unexplained refusal to avail himself of the recount mechanisms available to him under state law – undercut any allegation of irreparable harm.  See Voice of the Arab World, 645 F.3d at 36 (plaintiff's "leisurely pace and lack of urgency undercut a presumption of irreparable harm"); Akebia Therapeutics, Inc. v. Azar, 443 F. Supp. 3d 219, 231 (D. Mass.), aff'd, 976 F.3d 86 (1st Cir. 2020) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").  In light of Plaintiff's months-long delay in bringing this suit, his claim of irreparable harm rings hollow.

## IV.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST, AND THE EQUITIES DO NOT FAVOR PLAINTIFF.

The extraordinary relief Plaintiff seeks threatens to disenfranchise 3.6 million Massachusetts voters and strip the Commonwealth of half of its representation in the United

States Senate while this case, a hand recount, and possibly two new elections played out.  The magnitude of this request cannot be oversold, yet Plaintiff's late-in-the-day entreaty to decertify the results of two elections is caused solely by his inexplicable delay in bringing this action and his refusal to seek relief under the mechanisms afforded him by state law.  On this basis alone, his request should be denied.  See Voice of the Arab World, 45 F.3d at 35 (citations omitted); see also Hotze v. Hollins, 4:20-cv-03709, 2020 WL 6437668, at *3 (S.D. Tex. Nov. 2, 2020) (noting that delay in seeking review of election-related issues is an equitable consideration for Court).

State law provided Plaintiff with remedies if he felt there was an error in vote tabulation, but the time for requesting such remedies has long since passed.  First, Plaintiff could have sought a recount after the September 1, 2020 primary election he lost or after the November 3, 2020 general election he also lost.  See Mass. Gen. Laws ch. 54, § 135.  For the September 1, 2020 primary, any recount had to be requested by September 4, 2020; for the general election, any recount had to be requested by November 13, 2020.  See 2019 Mass. Stat. ch. 142, § 88; Mass. Gen. Laws ch. 54, § 135.  Plaintiff did not avail himself of this recount option, in which he could have requested ballots be counted by hand.  Second, Plaintiff also could have contested the primary election or the general election within 30 days pursuant to Mass. Gen. Laws ch. 54, § 134.  Again, Plaintiff failed to file a timely election contest pursuant to this statute.  Having failed to avail himself of the remedies provided by state law, Plaintiff cannot now ask the Court to absolve him of that failure and order relief that is far more dramatic, relief that would disenfranchise millions of voters.  Where Plaintiff failed to exercise his rights under state law to request a prompt recount or to timely contest the results of the two elections, he cannot now do so through a federal suit in equity.  Plaintiff's delay undercuts his claimed entitlement to equitable relief, as "the law ministers to the vigilant[,] not to those who sleep upon perceptible

rights."  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989).

Plaintiff's request is also not in the public interest.  Federal courts have frequently recognized that state elections should generally be left to the states.  "Election law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts."  Bonas v. Town of North Smithfield, 265 F.3d 69, 74 (1st Cir. 2001).  Although the right to vote in a state election is in the final analysis bottomed on federal law, Reynolds v. Sims, 377 U.S. 533 (1964), that right is "properly limited by respect for the political and federal framework established by the Constitution.  This framework [in the first instance] leaves the conduct of state elections to the states."  Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980).  As the First Circuit has recognized, federal courts should avoid meddling in disputes over vote counting absent truly earthshaking circumstances.[5]  See Griffin, 570 F.2d at 1076-77.  Federal courts are "not equipped nor empowered to supervise the administration of a local election," and because of this, "local election irregularities, including even claims of official misconduct, do not usually rise to the level of constitutional violations where adequate state corrective procedures," like the ones Plaintiff failed to use here, "exist."  Id. at 1077.

It is not appropriate for this Court to interfere with state election results, particularly where Plaintiff failed to avail himself of the remedies provided by state law.  The Commonwealth conducted the general election relying on Plaintiff's decision not to seek a

---

[5]     By way of example, the First Circuit explained that "Federal court intervention into the state's conduct of elections for reasons other than racial discrimination has tended, for the most part, to be limited to striking down state laws or rules of general application which improperly restrict or constrict the franchise."  Id. at 1076.  Otherwise, courts should only intervene if "the election process itself reaches the point of patent and fundamental unfairness," but such "a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane."  Id. at 1077.  No well-founded allegations remotely approaching this threshold are made in this case.

recount.  It certified the results of the election relying on Plaintiff's second decision not to seek a recount.  As the state's Supreme Judicial Court has recognized, "[d]eadlines are also a necessary part of the election process, particularly the primary election, which must be completed in a timely fashion to set the stage for the general election."  Grossman v. Sec'y of the Commonwealth, 485 Mass. 541, 550 (2020).  Plaintiff should not be rewarded for his delay.

Plaintiff's requested relief is also not in the interest of Massachusetts voters, who participated in the election in record numbers despite a global pandemic.  That Plaintiff seeks to disenfranchise these voters just because he does not like the results of the election is gravely disquieting and about as far from the public interest as imaginable.  See King, 2020 WL 7134198, at *13 (injunction overturning election not in public interest where such a ruling would "disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results."); Bowyer, 2020 WL 7238261, at *15 (injunction to overturn election results "would cause enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in the certified election results …. It would be more difficult to envision a case in which the balance of hardships would tip more strongly against a plaintiff.").  The public's interest is hardly served by the relief envisioned by Plaintiff, which would include cancelling the results of two elections, conducting a hand recount, and then potentially having two more new elections.  As one Court recently put it: "The People have spoken."  King, 2020 WL 7134198, at *13.  Their voice must be respected.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's motion for preliminary injunctive relief.

Respectfully submitted,

Defendants,

WILLIAM FRANCIS GALVIN, in his official capacity, and CHARLES D. BAKER, in his official capacity,

By his attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Adam Hornstine
Anne Sterman (BBO# 650426)
Adam Hornstine (BBO# 666296)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2048
Anne.Sterman@mass.gov
Adam.Hornstine@mass.gov

Date: January 8, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Adam Hornstine, Assistant Attorney General, hereby certify that I have this day, January 8, 2021, served the foregoing **Memorandum**, upon all parties, by electronically filing to all ECF registered parties, and paper copies will be sent to those indicated as non-registered ECF participants.

<u>/s/ Adam Hornstine</u>
Adam Hornstine