# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. SHIVA AYYADURAI,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>WILLIAM FRANCIS GALVIN, in his official capacity as the Secretary of the Commonwealth of Massachusetts, and CHARLES D. BAKER, in his official capacity as Governor of Massachusetts<br><br>　　　　Defendants. | CIVIL ACTION<br>NO. 1:20-cv-12080-MLW |

## **AFFIDAVIT OF MICHELLE K. TASSINARI**

　　I, Michelle K. Tassinari, on oath depose and state on personal knowledge and based on my review of the records of the Elections Division of the Office of the Secretary of the Commonwealth of Massachusetts (hereinafter, "the Elections Division") as follows:

　　1.　I am the director and legal counsel to the Elections Division. I have been legal counsel since April 2000 and director since 2005. As such, I have personal knowledge of the matters set forth herein.

　　2.　The Office of the Secretary of the Commonwealth through the Elections Division is responsible for administration of state and presidential primaries and elections in the Commonwealth of Massachusetts, including, among other things, responsibility for the printing of nomination papers, the receipt of certified nomination papers, the printing of candidate lists

2

and ballots, both official, early and absentee, certification of state primary results and compilation of state election results.

3. I am familiar with the candidacy of Shiva Ayyadurai for United States Senate, first as a Republican candidate in the September 1, 2020 primary election, and then as a write-in candidate for the November 3rd General Election.

4. Every voter in Massachusetts state and federal elections marks a paper ballot, whether by hand or by use of special adaptive equipment used by disabled voters, and those paper ballots are the official vote cast by that voter. Those paper ballots, which constitute the official record of votes cast in our elections, are stored by municipalities for 22 months after a federal election in accordance with federal law.

5. Municipalities in Massachusetts tabulate the votes recorded on those paper ballots in one of two ways: by hand-counting, or by use of an electronic tabulator.

6. Pursuant to state law, the Secretary's office is charged with certifying equipment used in Massachusetts elections, and only equipment so certified may be used. Mass. Gen. Laws. ch. 54, § 37; 950 CMR 50.00. In order to obtain certification by the Secretary's office, equipment must be submitted for an office demonstration and used successfully in two field tests. During the office demonstration, staff from the Secretary's Elections Division mark multiple ballots, tally those votes by hand, deposit them into the tabulator, and then compare the hand count to the machine count for accuracy and to ensure there are no anomalies. Machines approved for use in Massachusetts count all properly-cast votes and weight them equally.

7. Only four electronic tabulator machines are certified for use in Massachusetts elections: two types of optical scanning machines (AccuVote and Optech), and two types of

digital scanning machines (ImageCast and DS200). Optical scanning machines are not capable of making, storing, or transmitting images of ballots; they simply scan paper ballots for marked vote indicators and tabulate those vote indicators. Digital scanning machines have the technological capability to make and store images, but the Secretary's certification of those machines for use in Massachusetts elections is conditioned upon those functions being disabled. With this functionality turned off, the digital scanners operated similarly to the optical scanners by reading the vote indicators marked on the paper ballot.

8. I have confirmed with the vendors of those machines that the scanning functionality was disabled for both the September 1 primary and the November 3 general election. Therefore, no voting equipment used in Massachusetts created or stored ballot images.

9. Voting equipment used in Massachusetts elections must meet not only the Secretary's certifications standards but also federal standards, which are certified by an independent testing lab, that require recording each vote precisely as indicated by the voter and producing an accurate report of all votes cast, without "weighting" votes.

10. By regulation, all voting machines used in Massachusetts elections are tested before every election. The testing requires local election officials to mark at least 50 ballots for each precinct (in a primary, they must mark at least 50 ballots per party per precinct), which must be hand counted and then deposited into the tabulator. The results of the hand count are then compared to the results of the machine count. This testing process is performed in public and notice is posted at least 3 days in advance. If the testing process reveals any problems, including tabulation errors or mechanical failures, the local election officials must report those

errors to the Secretary's office. No such reports were made to the Secretary's office for either the September 1 primary or the November 3 general election.

11. In addition to the testing and certification process for tabulators, the accuracy and integrity of Massachusetts general election results are tested by a post-election audit as required by Mass. Gen. Laws ch. 54, § 109A. This audit is performed by conducting a public, non-computerized, random drawing to select 3% of precincts statewide to hand count ballots and compare those results to the previously-calculated results. That drawing must occur within 48 hours of the close of polls on Election Day.

12. This year, that drawing took place on November 5, 2020. As required by law, the selected precincts hand counted their ballots for offices of Electors for President and Vice President, Senator in Congress, Representative in Congress, Senator in General Court, and Representative in General Court, as well as one of the state-wide ballot questions. A post-election audit report was published containing the results of the audit. Overall, the audit found that in 47 of the 66 audited precincts, there was no change in the number of ballots cast; in the remaining precincts, the small disparities found were attributed to tabulator jams and/or poll worker error. Relevant to Plaintiff's claims, this year's audit resulted in candidate Markey receiving an additional 81 votes, candidate O'Connor receiving 28 fewer votes, and Plaintiff receiving 88 additional votes. The report noted that:

> The number of votes reported on Election Night as "All Others" was reduced by 60 and the blank votes were reduced by 81. It is likely that write-in candidate SHIVA AYYADURAI gained additional votes during the audit that were on ballots not segregated by the tabulator because voters did not fill in the vote indicator next to the write-in space, and poll workers failed to categorize write-in votes for the candidate separately from "All Others."

13. On November 25, 2020, the Governor's Council certified the results of this election, declaring that Senator Edward J. Markey had won the state's U.S. Senate election. Further, on November 30, 2020, the Governor signed a Certificate of Election, attested to by the Secretary, stating that Edward J. Markey was duly elected to the United States Senate. That certificate was transmitted to the President of the Senate on December 1, 2020, in accordance with federal law and Senate Rules, and Senator Markey was subsequently sworn in without any objection in the United States Senate.

14. For all elections, including the September 1st State Primaries and the November 3rd General Election, each city and town uses a paper voter list to record voters who are voting. This list contains the names and addresses of eligible voters for each precinct. The list is marked for each voter participating in the election. For a primary election, local election officials must also record the party ballot selected by voters not enrolled in a party.

15. After each primary and general election, the local election officials use those paper voter lists to update voter activity in the statewide database of registered voters. This information can be updated manually or by scanning a barcode printed on the voter list. There are often some small discrepancies between the number of voters checked on the paper list and the number of names contained on an electronic file produced after the data is entered in the statewide database. These discrepancies can be caused by inaccurate scanning, failing to save progress as data is entered, or inability to scan in primaries. For example, if a voter is not enrolled in a party and votes in a primary, but the local election official did not record the party ballot chosen by that voter, the local election official will be unable to update the voter activity.

16. The discrepancy in the electronic list provided to the Defendant from the City of Boston is easily explained. When the data was requested and provided to the Defendant, the City of Boston had not finished updating the voter activity from the paper lists using the process described above.

Signed under the pains and penalties of perjury this 8th day of January, 2021.

/s/ Michelle K. Tassinari
Michelle K. Tassinari